## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

AMERICAN CIVIL LIBERTIES UNION OF SOUTH
CAROLINA;

       *Plaintiff*,

   v.

BRYAN STIRLING, in his official capacity as
Executive Director of the South Carolina
Department of Corrections;

       *Defendant*.

Case No. 3:24-cv-00906-JDA

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL ALLEGATIONS ..............................................................................................3

    I.    SCDC's Categorical Ban on Press Access and Publication.......................3

    II.    Enforcement of the Challenged Policy ....................................................4

    III.    Plaintiff ACLU of South Carolina's Planned Activities...........................5

        A.    Sofia Cano........................................................................................6

        B.    Marion Bowman Jr. .......................................................................7

LEGAL STANDARD.........................................................................................................8

ARGUMENT ......................................................................................................................9

    I.    Plaintiff ACLU-SC is likely to prevail on the merits of its First Amendment claim.............................................................................9

        A.    The challenged policy is a content-based regulation on protected speech.................................................................................9

        B.    The challenged policy fails *Martinez*.......................................11

        C.    In the alternative, the challenged policy violates the "reasonable relationship" test from *Turner*. .................................17

        D.    Plaintiff ACLU-SC has standing. ............................................20

    II.    Because Plaintiffs' First Amendment rights are being violated, the remaining *Winter* factors are satisfied. ................................22

CONCLUSION.................................................................................................................23

i

## INTRODUCTION

The South Carolina Department of Corrections ("SCDC") enforces the nation's most restrictive policy on media access for prisoners. Unique among prison systems nationwide, SCDC takes the categorical position that "[i]nmates lose the privilege of speaking to the news media when they enter SCDC." The policy bans interviews on any topic and by any real-time means: in person, by video, or by phone. Only correspondence by mail is allowed. It also applies universally; that is, against any individual—including attorneys—that seeks to publicly disseminate prisoner speech. Finally, the policy prohibits the publication of any prisoner speech, no matter the topic. As a result of SCDC's policy (the "challenged policy"), people in its custody are deliberately and comprehensively shut out of the public discourse. This violates the First Amendment rights of prisoners and non-prisoners alike. *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

Defendant Director Bryan Stirling defends the challenged policy as "rooted in victim's rights," and maintains that "victims should [not] have to see the person who harmed them . . . on the evening news." But this justification does not alleviate the First Amendment problem; it sharpens it. Reaction-based restrictions on speech generally trigger strict scrutiny and a presumption of unconstitutionality. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 21 (1971) (scrutinizing "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it"); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (explaining that strict scrutiny applies to regulations reflecting "aversion" to what "disfavored speakers" have to say). And though federal courts have generally permitted circumscribed time, place, and manner restrictions on media access for incarcerated people, *no* federal court has upheld a total ban on interviews or publication. Rather, regulations concerning outgoing speech from prisons "must further an important or substantial government interest

1

unrelated to the suppression of expression." *Procunier v. Martinez*, 416 U.S. 396, 413 (1974). Substantial government interests include "security, order, and rehabilitation." *Id.* The policy must also be tailored to that interest, ensuring that any "limitation of First Amendment freedoms must be no greater than is necessary or essential." *Id.*

Here, SCDC's policy fails scrutiny. Defendant Stirling's justification is not a legitimate *penological* justification and, in any event, the challenged policy suppresses far more speech than is necessary to accommodate that interest. SCDC's interest in victims' rights does not trump well-settled First Amendment protections. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Bd.*, 502 U.S. 105, 118-22 (1991) (rejecting "victims' rights" as legitimate basis for taking a person's financial compensation from speaking or writing about their crime). And the policy's expansive categorical prohibition on speech necessarily lacks the tailoring required by the First Amendment. *Martinez*, 416 U.S. at 414 n.14.

The challenged policy is causing an immediate and ongoing harm to Plaintiff American Civil Liberties Union of South Carolina ("ACLU-SC"). ACLU-SC has a First Amendment right to interview current and prospective clients, *In re Primus*, 436 U.S. 412, 427-28 (1978); to receive communications from incarcerated persons, *Martinez*, 416 U.S. at 408; and to publish the speech of the persons it interviews, *Near v. Minnesota*, 283 U.S. 697, 720 (1931). The challenged policy impermissibly burdens each of these rights. Here, Plaintiff ACLU-SC specifically asserts its First Amendment right to interview two clients, Sofia Cano and Marion Bowman, Jr., and to publish the content of the interviews in a series of blog posts and audio podcasts.

Sofia Cano is a transgender woman incarcerated at SCDC whose untreated gender dysphoria has continued to cause her serious distress. Plaintiff ACLU-SC represents Ms. Cano in a separate lawsuit challenging SCDC's denial of care. Ms. Cano wants to share her story publicly and help explain why transgender healthcare bans (a topic of acute public concern) are hurtful and misguided. Apart from supporting its client's wishes, ACLU-SC also wants to publish Ms.

Cano's speech in service of its own political advocacy in support of transgender South Carolinians.

Marion Bowman Jr. is a man held on South Carolina's death row. Bowman has exhausted his appeals and postconviction claims and is now preparing to petition for executive clemency. ACLU-SC is working with Mr. Bowman and his capital attorneys to help publicize his bid for clemency and to help him share information with the public about what life is like on death row in South Carolina. With executions set to begin soon, there is an urgent need to interview Mr. Bowman and publish a podcast while doing so still might have an impact. Aside from helping Mr. Bowman tell his story, ACLU-SC is separately motivated to tell his story in service of ACLU-SC's political advocacy against the death penalty and in favor of more humane conditions of confinement.

 Without prospective relief, Plaintiff ACLU-SC cannot engage in its protected activities without risking retaliation against itself and its clients. Its decision to self-censor is an acute and irreparable harm that establishes standing and the need for preliminary injunctive relief. SCDC's ban on interviews and publication is unconstitutional on its face and as applied to Plaintiff's planned activities and should be enjoined immediately to end the ongoing harm to Plaintiff, incarcerated people, their counsel, and the broader public.

**FACTUAL ALLEGATIONS**

I.      **SCDC's Categorical Ban on Press Access and Publication**

Prisoners' access to media interviews is governed by SCDC Policy GA-02.01, "Employee and Inmate Relations with News Media, Legislators, and Others." Ex. A. Under GA-02.01.8, "personal contact interviews with any SCDC inmate, untried county safekeeper, or death row inmate *by anyone* will be prohibited." Ex. A (emphasis added.) Though the text of the policy prohibits only "personal contact interviews," SCDC has a pattern and practice of categorically prohibiting incarcerated people from communicating with members of the press via video or telephone. Ex. B (Aug. 30, 2023 SCDC Press Release). And although prisoners can

write letters to the press, SCDC prohibits the publication of those letters. *See* Ex. C (noting that, according to Bryan Stirling, "inmates . . . are not allowed to publish their own writings in media outlets"). In a press release issued by SCDC on August 30, 2023, the department left no question about the categorical nature of its interview ban: "Inmates lose the privilege of speaking to the news media when they enter SCDC." Ex. B.

According to Defendant Stirling, the purpose of SCDC's interview ban is to ensure a victim of a crime is not exposed to the speech or expression of the crime's perpetrator. In an interview with The Post and Courier, Defendant Stirling explained that SCDC's interview ban is "rooted in victims' rights," and that "we don't think victims should have to see the person who harmed them or their family members on the evening news." Ex. C.

## II.     Enforcement of the Challenged Policy

On June 10, 2023, Richard Alexander ("Alex") Murdaugh, a South Carolina attorney who has been convicted of murder and is incarcerated at SCDC, spoke by phone with his attorney, Jim Griffin. During the call, Mr. Murdaugh described his time in custody at SCDC and read a portion of his journal. Griffin recorded portions of the phone call and later provided the recordings to Fox Nation for inclusion in a docu-series, "The Fall of the House of Murdaugh." *See* Ex. B & C. Notably, neither the call itself nor the information it contained implicated prison security in any way.

SCDC concluded that Mr. Murdaugh and Mr. Griffin's conversation "violate[d] SCDC's inmate interview policy," because "[i]nmates in the custody of the [SCDC] are not allowed to participate in interviews of this nature." Ex. D. As soon as SCDC found out about the publication of the recorded material, but before it conducted an investigation, SCDC revoked Murdaugh's tablet and phone privileges. It is unclear when or if Murdaugh's access to phones and tablets will be restored. Ex. E & F.

On top of punishing Mr. Murdaugh, SCDC sent a letter to attorney Mr. Griffin advising him that his actions were prohibited by SCDC policy and "could jeopardize [Griffin's]

telephonic communications with [Murdaugh] in the future." Ex. D. The threat of further enforcement could not have been clearer, with SCDC stating that it was "hopeful that this letter will put you [Mr. Griffin] on notice and caution you to refrain from further actions of this nature." Ex. D.

### III.    Plaintiff ACLU of South Carolina's Planned Activities

Plaintiff ACLU-SC has a long history of advocating on behalf of its clients and other incarcerated people in South Carolina. As part of its work, ACLU-SC regularly visits and calls people in SCDC custody. Chaney Decl. at ¶ 7. ACLU-SC also conducts extensive public advocacy on behalf of its clients and, more broadly, in pursuit of civil rights and civil liberties of all people in the state. *Id.* at ¶¶ 4-8. ACLU-SC's public advocacy and education use all forms of traditional and digital media and include both direct publication and publication through other media outlets. But for the interview ban, ACLU-SC would record and publish interviews with incarcerated people on many topics, as do other ACLU affiliates nationwide. Chaney Decl. at ¶¶ 30-33; *see also, e.g.*, "Ronald Johnson," ACLU of Colorado (available at: https://www.youtube.com/watch?v=bUMtgiiOxxA&t=274s) (sharing about an incarcerated person during COVID-19 and including audio recording of his voice).

Most immediately, ACLU-SC has a plan to publish recorded audio interviews with at least two clients in written and/or podcast form. Chaney Decl. at ¶¶ 24, 26. The interviews would be conducted by ACLU-SC Communications Director Paul Bowers, an experienced and award-winning journalist. *Id.* at ¶ 9. As a member of ACLU-SC staff, Mr. Bowers is responsible for the organization's multimedia advocacy and storytelling. He writes press releases, blogs, and news articles; conducts and publishes interviews; and has started recording a podcast to better platform

the stories and viewpoints of impacted individuals throughout South Carolina.[1] *Id.* at ¶¶ 10-15. As part of his efforts, he works directly with individuals who are incarcerated.

For example, in October of 2023, Bowers interviewed Brittany Martin—a Black woman wrongfully convicted and sentenced to four years in prison for her participation in a nonviolent Black Lives Matter protest in Sumter—and published a blog post about her case.[2] Chaney Decl. at ¶ 13. That blog is full of direct quotes from Ms. Martin and has been viewed over 2,200 times on ACLU-SC's website. *Id.* The only reason this interview was published with direct quotes from Ms. Martin is because she is held in the State of Illinois. *Id.* If Ms. Martin were held at SCDC, she would have been subject to discipline because of the direct publication of her words, and ACLU-SC would not have published the blog.

ACLU-SC currently represents two individuals in SCDC custody who urgently want to tell their stories publicly.

A.    Sofia Cano

Sofia Cano is a transgender woman incarcerated at SCDC. Chaney Decl. at ¶ 16. She was first incarcerated at age 13, and at age 16 began to experience deep incongruence with her assigned gender. *Id.* at ¶ 17. When she was 18, Cano began discussing her gender identity issues and resulting distress with mental health professionals at SCDC. *Id.* Eventually, Cano was diagnosed with gender dysphoria by prison officials. *Id.* Because of her gender dysphoria, Cano has experienced suicidal ideation and has attempted auto-castration. *Id.* Prevailing medical standards provide that Cano should receive hormone therapy, but SCDC refuses to provide that treatment. *Id.* Because of her untreated gender dysphoria, Cano has continued to endure serious distress. *Id.* Plaintiff ACLU-SC represents Ms. Cano in a lawsuit challenging SCDC's denial of

---

[1] When Bowers interviews individuals that ACLU-SC represents in an attorney-client capacity, he does not give legal advice. ACLU-SC does not claim attorney-client privilege or other protections that attach to attorney-client communications over Mr. Bower's interviews that are conducted for the purpose of publication.

[2] Paul Bowers, *An Update on Brittany Martin, A Black Activist Behind Bars*, ACLU of South Carolina (Oct. 17, 2023) (available at: https://www.aclusc.org/en/news/update-brittany-martin-black-activist-behind-bars).

care under the Eighth Amendment and under Title II of the Americans with Disabilities Act (ADA). *See Cano v. Stirling, et al.*, No. 9:22-cv-4247-JDA-MHC. *Id.* at ¶ 16. As part of that representation, Plaintiff has access to Ms. Cano by telephone and through in-person visitation.

At present, ACLU-SC is heavily involved in debates at the Statehouse over the legality and advisability of state-imposed restrictions on transgender healthcare. To help South Carolinians make an informed decision about the propriety of transgender healthcare bans, ACLU-SC would like to exercise its First Amendment right to share the speech of its client, Sofia Cano, with the public. Specifically, ACLU-SC seeks to share the effect of SCDC's inhumane denial of treatment in Ms. Cano's own words. *Id.* at ¶¶ 19-21.

B.    Marion Bowman Jr.

Marion Bowman Jr. is a man held on South Carolina's death row. Chaney Decl. at ¶ 21. Bowman has exhausted his appeals and postconviction claims and is now preparing to petition for executive clemency. *Id.* at ¶ 24. Under the South Carolina Constitution, the Governor has authority to commute a sentence of death to a sentence of life imprisonment. The decision to grant or deny clemency is discretionary, and the Governor's decision is accountable only to the political process. Although executions are currently stayed in South Carolina, the state has obtained pentobarbital and many expect death sentence to begin again soon. *Id.* at ¶¶ 27-28.

ACLU-SC's advocacy includes death penalty abolition, clemency, and improving prison conditions. Chaney Decl. at ¶ 5. As part of that advocacy, ACLU-SC is working with Mr. Bowman to help him raise awareness about his case and about what life is like on death row in South Carolina. *Id.* at ¶¶ 25-26. The goal of publishing Mr. Bowman's story is to increase political pressure in favor of clemency, to highlight the human costs of capital punishment, and to inform the public about the inhumane treatment endured by people incarcerated at SCDC. Plaintiff has access to Mr. Bowman by telephone, video calls, and through in-person visitation. *Id.* at ¶ 26. But under the challenged policy, Plaintiff is prohibited from recording its phone and

video calls with Mr. Bowman for the purpose of publication or otherwise publishing Mr. Bowman's speech.

A story *about* Marion Bowman—that is, a telling of his life behind bars—is not equivalent to a story *by* Marion Bowman. With executions set to begin as soon as this spring, there is great urgency to interview Mr. Bowman and publish a podcast in his own words before he is executed and while it still might help. Chaney Decl. at ¶¶ 28-30.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In a First Amendment case, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004). That is because a First Amendment injury is "unquestionably" irreparable, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and both the public interest and balance of equities are "established when there is a likely First Amendment violation," *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

"In a typical case, the party moving for a preliminary injunction bears the burden of establishing its likelihood of success on the merits." *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1349 (N.D. Ga. 2022). But "[i]n First Amendment cases the initial burden is flipped." *Id.* (quoting *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 133 (3rd Cir. 2020)). If the plaintiff makes "a colorable claim that the law restricts some form of speech," the burden then shifts to the government to "justify its restriction on speech under whatever level of scrutiny is appropriate." *Id.*; *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government

bears the burden of proving the constitutionality of its actions."). If the government fails to carry its burden, "the plaintiff must be deemed likely to prevail." *Id.*

## ARGUMENT

**I.      Plaintiff ACLU-SC is likely to prevail on the merits of its First Amendment claim.**

SCDC's categorical ban on prisoner speech in the media is unique nationwide. No other prison, state or federal, claims that "[i]nmates lose the privilege of speaking to the news media" when they are sentenced to prison. Ex. B & J. The challenged policy is irreconcilable with Supreme Court precedent and restricts a substantial amount of protected speech on an ongoing basis. Moreover, because SCDC justifies the policy based on a claimed interest in protecting victims from being exposed to the speech of incarcerated people—rather than a cognizable interest in security, order, or rehabilitation—the interview ban fails even the deferential tests applied in the prison context.

**A.      The challenged policy is a content-based regulation on protected speech.**

Although the challenged policy is facially content neutral, its speaker-based restrictions are content-driven. As the Supreme Court has explained, "[t]he fact that a distinction is speaker based does not . . . automatically render the distinction content neutral." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 170 (2015). This is "[b]ecause 'speech restrictions based on the identity of the speaker are all too often simply a means to control content.'" *Id.* (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). That is the case here. By Defendant's own admission, the challenged policy suppresses speech because of "the content of the speech and the direct impact that speech has on its listeners." *Playboy Entm't Grp., Inc.*, 529 U.S. at 811-12. "This is the essence of content-based regulation." *Id.*; *see also Erznovik v. City of Jacksonville*, 422 U.S. 205, 209 (1975) ("[W]hen the government, acting as censor, undertakes selectively to shield the public from some kinds of speech . . . the First Amendment strictly limits its power.").

9

There can be no doubt that prison media interviews are protected by the First Amendment. Courts have long recognized that "the condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, peculiarly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear." *Nolan v. Fitzpatrick*, 451 F.2d 545, 547-48 (1st Cir. 1971). And the Supreme Court has recognized that "[w]hatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Turner*, 482 U.S. at 85.

Plaintiff ACLU-SC has a First Amendment right to advise clients and other people of their legal rights, to solicit prospective litigants, and to engage in related advocacy "for the advancement of beliefs and ideas." *NAACP v. Button,* 371 U.S. 415, 429-430 (1963). The Supreme Court recognized that for NAACP, "litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state, and local, for the members of the Negro community in this country. It is thus a form of political expression." *Id.* at 429. Fifteen years later, in a case involving an ACLU attorney's attempts to communicate with a potential litigant in South Carolina, the Court reaffirmed *Button* making clear that "[f]or the ACLU, as for the NAACP, 'litigation is not a technique of resolving private differences'; it is 'a form of political expression' and 'political association.'" *In re Primus*, 436 U.S. at 427-28 (quoting *Button*). In holding that the First Amendment protects "advocating lawful means of vindicating legal rights," the Court explicitly noted that ACLU's protected activities include both litigation and "communicating useful information to the public." *Id.* at 430; *see Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("As a general matter, state action to punish the publication of truthful information seldom can satisfy constitutional standards.") (internal marks omitted).

10

The Supreme Court has also emphasized that attorney speech protections are especially strong when attorneys are "engaged not in solicitation of clients or advertising for his practice, as in our precedents from which some [Justices] would discern a standard of diminished First Amendment protection," but in speech that is "directed at public officials and their conduct in office." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1033-34 (1991); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018) ("[The] Court has applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers."). In *Gentile*, the Court went on to hold that "[t]here is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Id*.

B.    The challenged policy fails *Martinez*.

Although the general test for evaluating limitations on fundamental rights in prisons is found in *Turner v. Safley*, 482 U.S. 78, 84 (1987), the applicable standard for outgoing communications from prison is found in *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974). *See Thornburgh*, 490 U.S. 401 (holding that *Martinez*, not *Turner*, governs outgoing communications because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials"). Here, the challenged policy suppresses publication of prisoner speech in the media to shield victims from that speech. Because it exclusively targets speech *leaving* the prison based on its purported effect on individuals *outside* the prison, the challenged policy must satisfy the more exacting test from *Martinez*. *See Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1119-1120 (D. Colo. 2007) (holding that under *Thornburgh*, restrictions on media contact for prisoners are governed by *Martinez*, not *Turner*).

Under *Martinez,* Defendant Stirling must show that the challenged policy (1) furthers an important or substantial governmental interest unrelated to the suppression of expression; and (2) that the limitation of First Amendment freedoms is no greater than is necessary or essential to the

protection of the particular governmental interest involved. *Martinez*, 416 U.S. at 413-14. The challenged policy fails both prongs.

> **1.    The challenged policy does not further an important or substantial government interest unrelated to the suppression of expression.**

To justify a limitation on outgoing correspondence from prisoners, prison officials "must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation." *Martinez*, 416 U.S. at 413. The list of legitimate penological interests is not limitless, and courts have resisted efforts to augment the interests listed in *Martinez*. *See, e.g.*, *Guajardo v. Estelle*, 568 F. Supp. 1354, 1366 (S.D. Tex. 1983) (explaining that a First Amendment deprivation "for purposes of punishment . . . would be unconstitutional"). To justify a restriction on outgoing prisoner speech, the "important or substantial governmental interest" must also be "unrelated to the suppression of expression." *Martinez*, 416 U.S. at 413 ("Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions.").

Here, SCDC's rationale for the challenged policy fails twice over. First, it is not tethered to an interest named in *Martinez*, or to any other interest especially within the expertise of prison officials. Rather, SCDC asserts that the ban is necessary to protect "victims' rights." *See* Ex. B & C. This makes the challenged policy qualitatively different from speech restrictions that, in service of security, order, or administration, impose an incidental burden on free speech. Here, SCDC is deliberately engaging in "the suppression of expression," for its own sake. *Martinez*, U.S. at 413. The challenged policy is rooted not in prison administration but in a political determination that crime victims should not "have to see the person who harmed them . . . on the evening news." Given its non-penological and content-based justification, the challenged policy forfeits the deferential treatment generally afforded prison regulations.

"As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). As a result, "reactive harms"—that is, those predicated on an emotional response to speech— "generally

12

may *not* be used as justifications for regulation of speech." 1 Smolla & Nimmer on Freedom of Speech §§ 4.18-19. Rather, "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it" is only permissible "upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen*, 403 U.S. at 21; *see also Snyder*, 562 U.S. at 453 ("As a general matter, we have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech.").

Crime victims are not a captive audience, and publication of prisoner speech in the media does not implicate a "substantial privacy interest" being invaded in an "intolerable manner." *Cohen*, 403 U.S. at 21; *see Snyder*, 562 U.S. at 459 (holding that First Amendment protects deeply offensive picketing at fallen soldier's funeral). Now more than ever, individuals are in control over what media they consume. If they observe a disagreeable message, they can turn it off, mute it, change the channel, change the app, or censor their feed. And in many cases, doing so will train the algorithm to suppress similar content in the future. For this and other reasons, the Supreme Court has never recognized the discomfort of crime victims as a valid basis for censoring prisoner speech.

### 2.     The challenged policy limits far more speech than is necessary.

Even if SCDC managed to cite a cognizable government interest, such as security, order, or rehabilitation, SCDC's interview ban fails the second prong of *Martinez* because the limitations on speech are far more restrictive than is necessary or essential to achieve any such interest. To counsel's knowledge, South Carolina's interview policy is the most aggressive in the nation. *See* Ex. H & J (50 State Prison Policy Analysis on Media Access). This alone greatly undermines the need for the policy. *See, e.g.*, *Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015) ("That so many other prisons allow [the challenged activity] . . . suggests that the Department could satisfy its security concerns through a means less restrictive.") (citing *Martinez*, 416 U.S. at 414 n.14 ("While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction."));

*McCullen v. Coakley*, 573 U.S. 464, 490 (2014) (noting the fact that no other state had a law as restrictive on speech as the state law at issue "raise[s] concern that the [state] has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage").

A regulation is overbroad, and thus facially violative of the First Amendment, when it "reaches a substantial amount of constitutionally protected conduct." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987). The challenged policy does just that. SCDC's written policy restricts all in-person interviews with incarcerated people. Ex. A. And if that were the entire policy, it would likely survive scrutiny. *See Pell v. Procunier*, 417 U.S. 817 (1974) (upholding discretion of prison officials to approve or deny physical entry into facility); *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974) (same). Indeed, the federal Bureau of Prisons and many state prisons impose limited time, place, and manner restrictions on press access. But unlike those policies, SCDC's interview ban does not leave open ample—or really, *any*—alternatives for communication. *See, e.g.*, *Pell*, 417 U.S. at 815-26 (restricting press access is constitutional "[s]o long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved."). In *Pell*, the Supreme Court allowed the prison's restriction on press access because prisoners retained "an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison." In South Carolina, that is not true. SCDC has shown that it will even enforce its interview ban directly against lawyers who help their clients communicate with the press. *See, e.g.*, Ex. D.

Even if the Court were to accept SCDC's victims' rights justification as a legitimate interest under *Martinez*, the policy still lacks the close fit required by the First Amendment. *Martinez*, 416 U.S. at 413-14 (requiring that the restriction on speech be "no greater than is necessary or essential to the protection of the particular governmental interest involved"). To start, there is no proof that the challenged policy addresses an "actual problem." *See Playboy Entm't. Grp., Inc.*, 529 U.S. at 822-23 ("We agree that the Government has failed to establish a

14

pervasive, nationwide problem justifying its nationwide daytime speech ban."). One can imagine the *possibility* of a crime victim being hurt by an incarcerated person's speech in the media, but speech restrictions cannot rest on theoretical concerns. *Id.*; *see Brown*, 564 U.S. at 799. Beyond that, not all crimes have victims that need protecting. Some offenses—like drug possession and prostitution—have no victim at all. Inchoate crimes, like attempts and conspiracies, often have victims that experienced no harm. Many property crimes involve victims who, because of returned property or paid restitution, have already been made whole. Finally, many victims harbor no animosity and instead seek affirmative contact and reconciliation with their perpetrators. Given that many people held at SCDC are incarcerated for victimless or quasi-victimless crimes, a policy that prevents *all* prisoners—irrespective of the existence, involvement, or attitude of the associated victim—from communicating with the press or publishing speech in the media is woefully overinclusive in its sweep.

There are also far less restrictive ways to accommodate SCDC's concerns about the potential discomfort of crime victims. Several states enforce policies that address SCDC's concern,[3] but they achieve those interests without unduly limiting speech. *See generally* Ex. J. For example, some states notify victims when there is a press inquiry or interview scheduled with an incarcerated person, which allows the victims to avoid exposure to the speech if they so desire. *See, e.g.*, Ex. J at 62 (Alaska), 186 (Kentucky), 198 (Maine).

Rather than the tailored approach applied elsewhere, SCDC enforces an aggressive, categorical prohibition. This type of unconditional limitation on First Amendment rights to protect victims has never been upheld. For example, in *Ariz. Attorneys for Crim. Justice v. Ducey*, 638 F. Supp. 3d 1048, 1056 (D. Ariz. 2022), the court struck down on First Amendment

---

[3] Unlike SCDC, however, other states do not treat the potential impact to crime victims as an overriding interest or as a standalone justification for their media access policies. *See generally* Ex. J. Rather, other states rely on security, administration, and order to justify their (far less onerous) restrictions on media access. *See, e.g.*, Ex. J at 89 (Colorado) ("The DOC will provide for reasonable access . . . subject to the limitations necessary to maintain order and security, and promote the rehabilitative goals of the DOC"), 195 (Maine) (relying on interests in "safety, security, and orderly management").

grounds an Arizona law prohibiting criminal defense attorneys from contacting crime victims except through the prosecutor's office. Finding that the law "regulated speech as speech," the district court concluded that the law was not narrowly tailored to accomplishing the state's interest in "protecting victims from being retraumatized." *Id.* at 1081. The court noted that Arizona failed to show that its policy responded to an "actual problem," that other states protect victims from harassment and intimidation without prohibiting contact by defense counsel, and that there is no evidence that contact with the defense team "is any more or less likely to retraumatize a victim than contact with the prosecutor or any other participant in the legal system." *Id.* at 1082-83.

In addition to being fatally overinclusive, SCDC's practices also reveal that the challenged policy is unreasonably *underinclusive. See Yellowbear v. Lampert*, 741 F.3d 48, 60-61 (10th Cir. 2014) (Gorsuch, J.) ("A law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all."); *see also Coward v. Robinson*, 276 F. Supp. 3d 544, 571 (E.D. Va. 2017) ("As an initial matter, the means the Department is using to advance its interests in prison order and institutional security are substantially underinclusive."). Despite its professed commitment to "victims' rights," SCDC itself provides the media with recordings of conversations involving prisoners. FITSNews, for example, has trumpeted the fact that SCDC provided it with text messages, photographs, and audio recordings involving Alex Murdaugh, including his recorded jail calls with loved ones. Ex. G. Not only does FITSNews report on those materials, it also publishes the original materials for public consumption. *Id.* ("[T]his week we published the latest release. That batch of materials contained three audio files – two apparent hang-ups and one connected call between Murdaugh and his surviving son, Buster Murdaugh."); *see also* Alex and Buster Murdaugh's Jail Phone Call – 5/16/23, FITSNEWS (available at: https://www.youtube.com/watch?v=7rwiM7rsnlc) (viewed over 42,000 times). Given that SCDC willfully shares the recorded speech of incarcerated people for publication by the news media,

16

the inference is raised that "the government's claimed interest" in protecting the sensibilities of victims "isn't actually so compelling after all." *Yellowbear*, 741 F.3d at 61.

In sum, the challenged policy simply "burdens too much and furthers too little." *Washington Post v. McManus*, 944 F.3d 506, 523 (4th Cir. 2019). Because the policy lacks the tailoring required by *Martinez*, it violates the First Amendment.

C.    In the alternative, the challenged policy violates the "reasonable relationship" test from *Turner*.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established a more deferential general test for limitations on "fundamental rights" in prisons. In that case, the Court evaluated a Missouri prison policy that restricted the ability of incarcerated people to correspond by mail with prisoners at other prison facilities. The Court upheld the policy as reasonably related to a legitimate penological interest and announced a new, four-part test. Under the *Turner* test, the prison must first demonstrate that there is a "valid, rational connection between the prison regulation and the legitimate public interest put forward to justify it." *Id.* at 89; *see Morrison v. Garraghty*, 239 F.3d 648, 660 (4th Cir. 2001) ("Defendants failed, however, to demonstrate that [their policy] . . . is reasonably related to this legitimate penological interest."). If the first factor is satisfied, courts must then weigh three more factors: whether there are "alternative means of exercising the right that remain open to the prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and, finally, whether there is a "ready alternative . . . that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." *Turner,* 482 U.S. at 90-91; *see also Morrison v. Hall*, 261 F.3d 896, 901, 904 (9th Cir. 2001) (holding that, under *Turner*, failure to show rational relationship between regulation and state interest is dispositive).

### 1.    The challenged policy is not entitled to deference because it fails the first *Turner* factor.

The only legitimate penological interests identified in *Turner* are "security," "rehabilitation," and "institutional order." *See* 482 U.S. at 89, 91. These interests implicate both the special expertise of prison officials and the strong reluctance of federal courts to micromanage those matters. *See Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 128 (1977) ("[T]he informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning institutional operations in [potentially dangerous] situations."); *Jewell v. Gonzales*, 420 F. Supp. 2d 406, 427 (W.D. Pa. 2006) ("*Turner*'s deferential standard of review is rooted in a judicial aversion to meddling in fundamental matters of *prison administration*"). In the dozens of cases applying *Turner*, Plaintiff knows of no other case that recognizes a legitimate penological interest beyond security, order, and rehabilitation. *See, e.g.*, *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 357 (4th Cir. 2021) (requiring, under *Turner*, the identification of a "non-punitive" penological interest).

Here, SCDC has not defended the challenged policy on grounds of its necessity to maintain "security," "order," or "rehabilitation." Rather, Defendant Stirling has invoked a reaction-based justification that is untethered from prison administration. Because protecting certain members of the public from being offended by the speech of others is not a *penological* interest at all, it does not trigger the deferential scrutiny afforded to prison officials under *Turner*. Far from territory where the courts lack expertise, the challenged policy is rooted in a governmental interest that is well explored and long denounced by the Supreme Court:  the suppression of disfavored speech. *See, e.g.*, *Cohen*, 403 U.S. at 21 ("The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it," is only permissible "upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner."). Because the challenged policy is not grounded in a penological interest and cannot satisfy the strict scrutiny that would otherwise apply to a reaction-based speech restriction, the policy violates the First Amendment.

But even if the Court infers a legitimate penological justification for the challenged policy, SCDC's categorical ban on interviews and publication is not reasonably related to security, order, or rehabilitation. A policy is not rationally related if it is wildly overinclusive or underinclusive relative to the asserted interest. *See Human Rts. Def. Ctr. v. Southwest Va. Reg. Jail Auth.*, 396 F. Supp. 3d 607, 620 (W.D. Va. 2019) (holding that categorical ban on incoming books, though justified by a legitimate interest in "preventing fires and drug smuggling," was "not rationally related to those interests"); *cf. Pell*, 417 U.S. at 827 (holding that security considerations, though "sufficiently paramount in the administration of the prison," "would not permit prison officials to prohibit *all* expression or communication by prison inmates" (emphasis added)). Courts have upheld restrictions on in-person interviews with incarcerated persons, noting the inherent security concerns associated with visiting a prison. *See Pell*, 417 U.S. 817; *Saxbe*, 417 U.S. 843. But here, the challenged policy goes much farther. By banning all forms of real-time communication, including phone and video calls which occur at no cost to the prison, *see* Ex. I at 2 ("SCDC will no incur any costs associated with inmate tablets and kiosks"), the challenged policy is revealed as not rationally related (if related at all) to any legitimate penological interest.

### 2. The challenged policy also fails the remaining *Turner* factors.

Though the Court need not reach this far, the challenged policy also fails the remaining factors of *Turner*. On the second factor, the policy provides no alternative means for incarcerated people to add their voices to the public discourse—all interviews on any topic are prohibited whether in-person, by video, or by phone. Ex. B. And though some circuits construe constitutional interests "at a broad level of generality, leaving open the ability to easily find alternative ways of exercising that right," the Fourth Circuit "has declined to read the import of *Thornburgh* so expansively" and instead applies *Turner*'s alternative means factor "at a fairly specific level." *Heyer*, 984 F.3d at 358 (holding that BOP restriction on point-to-point calls failed to leave open alternative means for incarcerated person to communicate with Deaf

community). Given the rights of incarcerated persons to communicate with the public, including through the press, the challenged policy provides no available alternatives.

On the third factor, SCDC's policy again fails. Unlike cases that seek augmented visitation access, granting Plaintiff's demands would not "cause a significant reallocation of the prison system's financial resources [or] impair the ability of corrections officers to protect all who are inside a prison's walls." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (affirming prison regulation limiting number of approved visitors). Analyzed from the perspective of security, order, and administration, the interviews prohibited by the challenged policy are functionally indistinguishable from the interviews with attorneys, family members, and friends that SCDC routinely permits. Here, for example, Plaintiff does not seek additional *access* to its clients; it seeks only to be free from censorship during and after the interview. Given that these conversations are already happening, permitting interviews for the purpose of publication (and permitting publication itself) will not affect SCDC guards or other prisoners.

Finally, the challenged policy also fails *Turner*'s fourth factor. There are many other ways to regulate public speech by incarcerated people short of a categorical ban, *see supra* Arg. I.B.2—indeed, *every* other prison system appears to have found one.

D.    Plaintiff ACLU-SC has standing.

As discussed above, ACLU-SC currently represents two incarcerated individuals, Sofia Cano and Marion Bowman, who seek to publish speech on important political issues, but cannot do so because of the challenged policy. Alone, this fact establishes standing. The Fourth Circuit has warned that courts must not "take a cramped view of standing in civil rights cases, lest [they] impair the remedial purpose Congress had in mind when enacting civil rights statutes." *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019). This is particularly true in First Amendment cases, where standing requirements "are somewhat relaxed." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013); *see also, e.g., Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt

dramatically toward a finding of standing.") (citations omitted). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235.

By threatening recourse against non-prisoners like ACLU-SC—including threats to restrict attorney-client communications, *see* Ex. D—SCDC inflicts a traceable and redressable injury-in-fact on Plaintiff's First Amendment freedoms. But even if SCDC only punished incarcerated people, ACLU-SC would still be injured by SCDC's policy. *See Canadian Coal. Against Death Penalty v. Ryan*, 269 F. Supp. 2d 1199, 1201 (D. Ariz. 2003) ("Although actual enforcement of HB 2376 is directed at prisoners, Plaintiffs [organizations] have standing to challenge HB 2376's limiting effects."); *Martinez*, 416 U.S. at 409 ("[C]ensorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendment rights of those who are not prisoners.").

To start, SCDC's intent to punish Bowman and Cano imposes a significant burden on ACLU-SC's willingness to publish their speech—an activity otherwise protected by the First Amendment. So much so, in fact, that ACLU-SC has elected to self-censor and seek pre-enforcement relief from this Court rather than triggering retaliation against Bowman and Cano. Chaney Decl. at ¶ 34. It is well settled that self-censorship is an injury sufficient to confer standing. *See Cooksey*, 721 F.3d at 235 (noting that, in First Amendment cases, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship"); *see also Webb v. Paine*, 515 F. Supp. 3d 466, 482 (S.D.W. Va. 2021) (holding that Plaintiff's decision to refrain from protected online speech out of fear that his client would be retaliated against was sufficient to demonstrate standing).

Beyond its First Amendment right to publish lawfully obtained prisoner speech, SCDC's interview ban also injures ACLU-SC's First Amendment right to receive information by intentionally chilling the speech of incarcerated persons about matters of deep public importance. It is "well established" that the First Amendment not only protects the right to speak and express ideas, but also the corresponding "right to receive information and ideas." *Kleindienst v. Mandel*,

408 U.S. 753, 762 (1972). In *Lamont v. Postmaster General of U.S.*, 381 U.S. 301, 307-08

(1965), for example, Justices Brennan and Goldberg wrote separately to praise the majority's

recognition that the First Amendment protects not just the rights of *senders*, but also the rights of

*recipients* of information. Explaining their position, they wrote: "The dissemination of ideas can

accomplish nothing if otherwise willing addressees are not free to receive and consider them. It

would be a barren marketplace of ideas that had only sellers and no buyers." *Id.* at 308.

Therefore, by burdening the expression of individuals held at SCDC, Defendant Stirling has also

burdened the downstream rights of ACLU-SC to *receive* that expression.[4] *Martinez*, 416 U.S. at

408  ("[C]ensorship of the communication between [a prisoner and someone else] necessarily

impinges on the interests of each."); *see Thomas v. Collins*, 323 U.S. 516, 534 (1945) (holding

that state law burdening unionization abridged the rights of a labor organizer *and* the rights of

workers "to hear what [the organizer] had to say").

II.     **Because Plaintiffs' First Amendment rights are being violated, the remaining**
        ***Winter*** **factors are satisfied.**

In a First Amendment case such as this, "the likelihood of success on the merits is the

dominant, if not the dispositive, factor" for granting or denying a preliminary injunction. *Walsh*,

733 F.3d at 488; *see also Joelner*, 378 F.3d at 620; *Connection Distrib. Co. v. Reno*, 154 F.3d

281, 288 (6th Cir. 1998). That is because a First Amendment injury is *per se* irreparable, *Johnson*

*v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978), and the public interest and balance of equities are

"established when there is a likely First Amendment violation," *Centro Tepeyac*, 722 F.3d at

191.

Beyond the automatic irreparable harm that flows from a First Amendment injury, there

are additional acute, irreparable harms at stake here. Marion Bowman, one of the SCDC

---

[4] ACLU-SC does not allege that it is being unlawfully denied access to its clients or other persons held at SCDC. Unlike in *Pell v. Procunier*, 417 U.S. 817 (1974), where the Supreme Court rejected reporters' arguments that the First Amendment guarantees special *access* to prisoners, ACLU-SC already has access to Cano and Bowman. Rather, ACLU-SC argues that SCDC's anti-press policy burdens the exchange of information that occurs during meetings it can already permissibly arrange.

prisoners whose speech ACLU-SC seeks to amplify, is facing an imminent execution by the State of South Carolina. Along with speaking on matters of broad public importance (like the indefensibility of capital punishment and the conditions on SCDC's death row), Bowman's speech also bears directly on his petition for clemency. Without emergency action by this Court, ACLU-SC will be forced to either take action that will result in punishment to both it and Bowman, or else lose its chance to use its voice to further Bowman's clemency petition altogether.

## CONCLUSION

The challenged policy violates well-settled law. The Court should preliminarily enjoin enforcement of the challenged policy because it is unconstitutional on its face and as applied to Plaintiff ACLU-SC's planned activities. The policy is causing ongoing harm to Plaintiff, incarcerated people, their attorneys, and the public at large.

Plaintiff respectfully requests expedited consideration of this motion. A preliminary injunction will not relieve the irreparable harm to Plaintiff if it enters too late for Plaintiff to interview Mr. Bowman and publish his speech before the Governor's clemency decision. Given the gravity and urgency of the situation, expedited consideration is appropriate.

Dated:  February 23, 2024                                    Respectfully submitted,


**ACLU OF SOUTH CAROLINA**

*/s Allen Chaney*
Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org

23

**AMERICAN CIVIL LIBIERTIES UNION FOUNDATION**

Emerson J. Sykes*
Speech, Privacy, and Technology Project
125 Broad Street, 18th Floor
New York, NY 11230
Tel: (212) 549-2500
esykes@aclu.org

David C. Fathi**
National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005
Tel: (202) 548-6603
dfathi@aclu.org

Corene T. Kendrick*
National Prison Project
425 California St., Ste 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

*Attorneys for Plaintiff*

*  Motion for admission *pro hac vice* forthcoming

**  Motion for admission *pro hac vice* forthcoming; not admitted in DC, practice limited to federal courts.