IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| American Civil Liberties Union Foundation of South Carolina, | ) ) | Civil Action No. 3:24-cv-906-JDA |
| | ) | |
| Plaintiff, | ) ) | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S |
| vs. | ) ) | MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S |
| Bryan Stirling, in his official capacity as Executive Director of the South Carolina Department of Corrections, | ) ) ) | MOTION FOR PRELIMINARY INJUNCTION |
| | ) | |
| Defendant. | ) ) | |

The Defendant, Bryan Stirling, in his official capacity as Executive Director of the South Carolina Department of Corrections, has moved for dismissal of the Complaint in this case pursuant to Rules 12(b)(1) and (6), FRCP.  Specifically, this Court lacks subject matter jurisdiction of this matter as it presents no case or justiciable controversy, and the Plaintiff lacks standing to pursue the claims asserted in this case.  In addition, the Plaintiff's allegations do not support the relief requested under established principles of law. For the reasons set forth below, Defendant submits that the requested relief is fully warranted as a matter of law.

In addition, the Plaintiff has moved for a preliminary injunction.  Should this matter survive dismissal, the injunctive relief sought by the Plaintiff cannot be justified under the applicable standards, and its request must be denied.

## FACTUAL BACKGROUND

### a. The Policy

The South Carolina Department of Corrections ("SCDC")[1], consistent with virtually every prison system in the United States, limits the access of the public, including journalists, to its inmates. Commencing on or about May 1, 2000, SCDC's restrictions included Policy/Procedure GA-02.1-8. Promulgated during the directorship of William Catoe, this regulation provides that:

> REQUESTS FOR INTERVIEWS WITH INMATES: Personal contact interviews with any SCDC inmate, untried county safekeeper, or death row inmate by anyone will be prohibited. (NOTE: This prohibition does not apply to internal or external law enforcement, Agency officials, internal and external auditors, or legal professionals who may need to interview inmates for purposes of an investigation or pending legal action or to researchers approved pursuant to SCDC Policy/Procedure ADM-15.07, "Research Conducted Within the SCDC.")

The SCDC has interpreted "personal contact" to include interviews by telephone. As implicit in this prohibition, recordation of such interviews by audio or visual means is also not allowed.

Prisoners are, however, allowed to correspond with members of the general public, including the media, subject to minimal restrictions. As detailed in the Affidavit of the Defendant's Director of Communications, Chrysti Shain, journalists have frequently interviewed inmates through the medium of written correspondence. *See* **Exhibit A** at ¶¶ 5 and 6. In addition, reporters are free to interview those individuals who are allowed access to inmates under the department's policies, such as attorneys and family members. Again, media representatives have regularly availed themselves of this avenue of communication with prisoners. *See id.* at ¶¶ 7 and 8.

---

[1] The named Defendant is the Executive Director of the SCDC in his official capacity. For the sake of simplicity, the Department itself will be referred to herein as "Defendant" regardless of whether Mr. Stirling was the Director at the time.

2

Contrary to the Plaintiff's allegations, the Defendant does not prohibit the publication of the speech of inmates communicated through these permissible methods.  For example, the *The Post & Courier* (Charleston) has published photographs of letters from prisoners on multiple occasions.  *See id.* at ¶ 10.   The Defendant did not seek to enjoin or otherwise prevent these publications and *The Post & Courier* did not suffer any repercussions from doing so.  *See id.* at ¶ 11.   Neither were any of the inmates involved subjected to discipline by the SCDC.  *See id.*

In its Complaint and its Motion for Preliminary Injunction, Plaintiff refers to an incident in 2023 involving Alex Murdaugh, a current SCDC inmate, and his attorney.  Murdaugh and his attorney improperly took advantage of SCDC's policy which allows inmates and their attorneys to communicate confidentially via an unmonitored telephone call. While the Defendant's regulation expressly exempts "legal professionals" from its purview, it does so only when they "may need to interview inmates for purposes of an investigation or pending legal action".   Nevertheless, Murdaugh and his attorney used their ability to communicate confidentially to conduct and record a personal contact interview on behalf of a media outlet, Fox Nation.   This interview constituted both a violation of the regulation by the inmate and an abuse of the privilege of free access on the part of his legal representative.

As a result of the incident, Murdaugh was disciplined through the loss of certain privileges. In addition, his attorney was cautioned that his ability to conduct unmonitored telephone conferences with his clients could be jeopardized by further abuses.  However, there were no consequences to Fox Nation for its participation in this ruse.  *See id.* at ¶¶ 13 and 14.  As these facts demonstrate, there is clear distinction under SCDC's policy between the actions of attorneys and the media.

3

####    b.   *Underlying Rationale for the Policy*

In addition to the protection of crime victims from invasions of privacy and psychological harm, the Defendant's policy supports a number of legitimate security and institutional concerns. *See* Affidavit of Bryan Antonelli (attached hereto as **Exhibit B**).  For example, it is well known that inmates may attempt to use coded language in communications with the outside world to further criminal activity both inside and outside the prison, such as drug trafficking, witness intimidation, money collection, prison escapes and even murder.  *See id.* at ¶ 7; *see also* https://www.corrections1.com/contraband/articles/contraband-cellphones-coded-messages-help-mexican-mafia-operate-in-calif-prisons-lgZu94hkmWs4hXNv/.     Although written communications can also be coded, that medium allows prison officials to conduct a detailed review of correspondence by trained professionals before it is delivered to the addressee or is otherwise shared with the outside world.  With personal contact interviews, spotting code must be done "on the fly" and simultaneously with the relay of this information to the interviewer.  Furthermore, personal contact interviews can also be used to send non-verbal coded communications—especially when videotaped.

Even when coded messages are not involved, the risk of coordinated criminal activity is also exacerbated by the publication of such interviews.  *See Turner v. Safley*, 482 U.S. 78, 92 (1987). This is particularly the case when gangs are involved because rival members may perceive slights, provocations, or instructions from seemingly innocuous statements.  Obviously, this can lead to unrest or work stoppages or other behaviors that can thoroughly disrupt the operations of the prison.  *See* Ex. B at ¶ 8.  There is also a significant risk that other prisoners may draw inferences from published statements regarding the beliefs, sexual orientation, or gang affiliations

4

of an interviewee resulting in disruptive or violent actions. *See, Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989).

Many penal institutions have encountered severe disciplinary problems when unfettered media access to inmates has created "virtual public figures" within the prison society.  Inmates who gain "celebrity status" within the prison system garner a disproportionate degree of notoriety and influence among their fellow inmates.  *See Pell v. Procunier*, 417 U.S. 817, 831-32 (1974). When these prisoners become "conspicuously publicized because of their repeated contacts with the press[, they] tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison".  *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 848-49 (1974); *see also* Ex. B at ¶ 9.  Clearly, such celebrity status is much more likely to result from the publication of video or audio recordings than from the written word.

The administrative burden associated with the allowance of personal contact interviews also cannot be dismissed.  *See Turner*, 482 U.S. at 81.  If SCDC's current restrictions were eliminated, considerable resources would have to be devoted to scheduling personal contact interviews.  And given the risk of coded or incendiary messaging, SCDC would also need to hire additional trained personnel to provide real-time monitoring of these interviews.  In many instances, it would also be necessary to take additional security measures to accommodate the process.  As should be obvious, this reallocation of prison resources would negatively impact the accomplishment of the Defendant's correctional mission.  *See* Ex. B at ¶ 10.

### c.  *Impact of Policy on Plaintiff*

The Plaintiff does not contend that it has been precluded from conducting inmate interviews through written correspondence or from interviewing individuals who have personal contact access to inmates.  It also does not allege that the Defendant has taken any action to prevent

5

its publication of any specific statement(s) or to "punish" it for doing so.  Neither does it assert

that it has been denied access to those prisoners alleged to be its "clients".  Rather, it simply fears

that the Defendant's policy could hypothetically impact its activities.

## DISCUSSION OF AUTHORITIES

I.    STANDING

Under the U.S. Constitution, the authority of our federal courts is limited to the exercise of

the judicial Power of the United States.  "Although the Constitution does not fully explain what is

meant by '[t]he judicial Power of the United States,' Art. III, § 1, it does specify that this power

extends only to 'Cases' and 'Controversies,' Art. III, §2.  And '[n]o principle is more fundamental

to the judiciary's proper role in our system of government than the constitutional limitation of

federal-court jurisdiction to actual cases or controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330,

337 (2016), quoting in part *Raines v. Byrd*, 521 U. S. 811, 818 (1997).  "One of the essential

elements of a legal case or controversy is that the plaintiff have standing to sue."  *Trump v. Hawaii*,

138 S. Ct. 2392, 2416 (2018).

Rather than a mere "keen interest in the issue", *Hollingsworth v. Perry*, 570 U. S. 693, 700

(2013), the doctrine of standing requires the demonstration of "a personal stake in the outcome of

the controversy."  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  The Supreme Court has recognized

that "refusal to serve as a forum for generalized grievances has a lengthy pedigree", *Lance v.

Coffman*, 549 U.S. 437, 439 (2007), and that "it ensures that courts exercise power that is judicial

in nature."  *Id.* at 441.  To effectively police these limits, the jurisprudence has:

> established that the irreducible constitutional minimum of standing contains three
> elements. First, the plaintiff must have suffered an "injury in fact" -- an invasion
> of a legally protected interest which is (a) concrete and particularized, see [*Allen
> v. Wright*, 468 U.S. 737 (1984)], at 756; *Warth v. Seldin*, 422 U.S. 490, 508, 45 L.
> Ed. 2d 343, 95 S. Ct. 2197 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740-741,

n. 16, 31 L. Ed. 2d 636, 92 S. Ct. 1361 (1972); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore* [*v. Arkansas*, 495 U.S. 149 (1992)], at 155 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983)). Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.*, at 38, 43.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

This "irreducible constitutional minimum" applies both to individuals and organizations. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) ("When determining whether an association has standing, a court conducts the same inquiry as in the case of an individual, determining if the plaintiff alleged such a personal stake in the outcome of the matter to warrant his invocation of federal court jurisdiction."). Furthermore, "the party invoking federal jurisdiction bears the burden of establishing [the] existence" of "[t]his triad of injury in fact, causation, and redressability". *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-104 (1998).

### a. *Third Party Injury*

In evaluating a litigant's claim of standing, it is axiomatic that a Plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Despite this prohibition, the Plaintiff's Complaint and Motion for Preliminary Injunction repeatedly reference or allude to alleged harm (or potential harm) to inmates or other third parties. *See, e.g.,* ECF No. 1 at ¶¶ 20, 21, 30, 50, 51; ECF No. 4-2 at ¶¶ 18, 24 and 33. While these allegations suggest that *someone* could potentially assert a colorable claim for relief, that *someone* is not the Plaintiff. *See, e.g.*, *Central South Carolina Chapter, Soc. of Professional Journalists, etc. v. Martin*, 431 F. Supp. 1182, 1187 ("Turning to the former concept of standing, this Court's

7

[gag] order of May 31st does not prohibit the public or press from doing anything but only limits the participants in the criminal case from conducting themselves in certain manners and therefore neither the public nor the press has suffered any personal injury other than the generalized complaint that they have been denied their 'right' to know.").

In this regard, the Plaintiff's Memorandum in Support of Preliminary Injunction argues that an injury sustained by an inmate is somehow sufficient to confer standing on the Plaintiff. *See* ECF No. 4-1 at p. 23. In support of this argument, the Plaintiff primarily relies on *Canadian Coalition Against the Death Penalty v. Ryan*, 269 F. Supp. 2d 1199, 1201 (D.Ariz. 2003). Tellingly, the discussion of standing in that case is limited to the single sentence included in the parenthetical quotation following the Plaintiff's citation thereto - *i.e.,* "[a]lthough actual enforcement of HB 2376 is directed at prisoners, Plaintiffs have standing to challenge HB 2376's limiting effects on the circulation of their message." Given this total lack of meaningful analysis, it is not surprising that *Ryan* does not appear to have been cited by a single case as to standing in the following two decades. More significantly, the two citations following *Ryan*'s holding do nothing to lend support to Plaintiff's claim of standing. To wit, footnote six in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), is limited to a discussion of the actual economic injury sustained by the Plaintiff organization. Likewise, *LSO, Ltd, v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000), rejected an attempt to distinguish *Bantam Books* by emphasizing the existence of actual economic

injury.[2]  Accordingly, the Plaintiff's reliance on potential harm to a non-party as substitute for its own injury is totally misplaced.[3]

### b. Organizational Standing

On the other hand, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  The caselaw is clear, however, that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient…." *Sierra Club v. Morton*, 405 U.S. 727, 739-740 (1972) ("The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations.  But if a 'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived. And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so."). In other words:

> standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy. "[That] concrete adverseness which sharpens the presentation of issues," *Baker v. Carr*, 369 U.S., at 204, is the anticipated consequence of

---

[2] The only other authority cited by the Plaintiff for this proposition, *Procunier v. Martinez*, 416 U.S. 396, 408  (1974), actually relates to an inmate's right to read personal correspondence and will be addressed in regard to the Plaintiff's argument based on "the right to receive  information and ideas".

[3] The Defendant recognizes that, "in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  As the Plaintiff's Complaint does not allege that any of the third parties referenced therein are "members" with "associational damage", this theory is not addressed in this memorandum.

proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

*Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 486 (1982).

Thus, the *Lujan* tripartite test for standing must be applied with these limitations in mind.

### i. *Injury in Fact*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 339 (2016) (citations omitted). Significantly, the resolution of this and other standing inquiries "hinges upon the facts at the inception of litigation." *Moss v. Spartanburg County Sch. Dist. No. 7*, 775 F. Supp. 2d 858, 868 (D.S.C. 2011)   As explained by the Supreme Court, courts "have an obligation to assure ourselves that [the plaintiff] had Article III standing at the outset of litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000).

In terms of "particularization", it is insufficient to assert a "generalized grievance" that is "undifferentiated". *See United States v. Richardson*, 418 U.S. 166, 177 (1974).  In the present case, the Plaintiff has emphasized that the Defendant's prohibition on "personal contact interviews" applies to "*anyone*". *See* ECF No. 1 at ¶ 13.  Therefore, this blanket restriction applies equally to all members of the public and any alleged injury is not particularized. As to the discrete question of "concreteness":

> A "concrete" injury must be "de facto"; that is, it must actually exist. *See* Black's Law Dictionary 506 (10th ed. 2014). When we have used the adjective "concrete," we have meant to convey the usual meaning of the term — "real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

10

*Spokeo*, 578 U.S. at 340.

Rather than alleging that it has actually been prevented from having discussions with inmates, the Plaintiff makes it clear that SCDC has permitted its "employees and agents to communicate freely with Mr. Bowman and Ms. Cano, including by arranging in person visits, telephone calls, and video calls." *See* ECF No. 4-2 at ¶ 31. In fact, it concedes that its Comunications Director has interviewed Ms. Cano regarding the issues relating to her case. *See id.* at ¶ 20. Thus, as of the inception of this litigation, the Plaintiff has not sustained any "concrete" injury from the regulation which "actually exists".

In addition to the regulation itself, the Plaintiff also alleges the Defendant prevents it from publishing the speech of inmates. Even assuming that such a policy exists, no argument is made that it would not apply equally to the general public. The Plaintiff also fails to point to any specific instance of a publication being stopped. Similarly, it does not allege that it has been threatened with consequences should it do so. Again, there is no particularized concrete injury alleged. *See Whitmore*, 495 U.S., at 158 ("threatened injury must be certainly impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient.).

Rather, the Plaintiff baldly claims that it has refrained from publication due to its fear of potential punishment being imposed on inmates and that this "self censorship" constitutes an injury in fact. It is fundamental, however, that "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 702 (1982). The application of this principle to a standing inquiry is illustrated by *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). In that matter, Amnesty International's concern that it might be subject to government surveillance prompted it to take certain actions, such as the avoidance of email and phone conversations with sources. *See id.* at 415. The Supreme

Court ruled that these alleged injuries were "self-inflicted" and could not give rise to standing.  *See id.* at 418.

While the Plaintiff correctly asserts "that standing requirements are *somewhat* relaxed in First Amendment cases", *see Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (emphasis added), they are not non-existent. First, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *See id.* at 236, quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).  Furthermore, as in *Cooksey*, the chilling effect is typically associated with the threat of harm to the Plaintiff itself, not to third parties.  *See id.* (Plaintiff threatened with legal proceedings); see also .  Finally, "a chilling effect amounts to a cognizable First Amendment injury only if it is 'objectively reasonable' - that is, if the challenged government action is 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018).

In this instance, there has been no threat to the Plaintiff or an explicit reference to the enjoining of publication as in *Cooksey*.  Furthermore, the courts have recognized that reporters have more than ordinary firmness to resist chill due to their participation in the "rough and tumble" world of "public debate".  *See Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 419 (4th Cir. 2006).  If the media in general possesses such firmness, how more so when backed by an organization with the history and reputation of the Plaintiff.  Therefore, while Plaintiff's counsel has done an admirable job of crafting the Complaint to create the illusion of an injury in fact, "pleadings must be something more than an ingenious academic exercise in the conceivable." *Warth*, 422 U.S. at 509, quoting *United States v. SCRAP*, 412 U.S. 669, 688 (1973).

12

### ii. *Traceability*

The Plaintiff must also establish that its injury is directly traceable to the Defendant's policy. In this regard, "when a plaintiff is not the direct subject of government action, but rather when the 'asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else,' satisfying standing requirements will be 'substantially more difficult.' *Frank Krasner Enters., Ltd. v. Montgomery County*, 401 F.3d 230, 234-35 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562)." *Lane v. Holder*, 703 F.3d 668, 673 (4th Cir. 2012). As discussed above, the regulation at issue is directed at inmates, not the Plaintiff. Furthermore, as discussed in the *Clapper* decision:

> the fundamental requirements of Article III [preclude litigants from] manufactur[ing] standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. Any ongoing injuries that respondents are suffering are not fairly traceable to [the statute in question].

*Clapper*, 568 U.S. at 416.

Consequently, "respondents' self-inflicted injuries [were] not fairly traceable to the Government's purported activities…and their subjective fear…[did] not give rise to standing." *Id.* at 418. The same situation is presented in the instant case as the Plaintiff's avoidance of certain actions based on speculation as to future harm to third parties which is not "certainly impending" is not traceable to the Defendant's regulation.

### iii. *Redressability*

Finally, the Plaintiff must also demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Significantly, the Plaintiff's representatives have already spoken with or interviewed the inmates in question. *See* ECF No. 4-2 at ¶¶ 20 and 25. Obviously, they were not chilled by the Defendant's

regulation and have already "received information and ideas" from these individuals. Additionally, they concede that an interview could be conducted through correspondence by mail. *See* ECF No. 1 at ¶ 2. Thus, any conceivable existing injury to the organization would not be redressed by a decision favorable the Plaintiff in this case.

## II.     FAILURE TO STATE A CLAIM

Even if the Plaintiff has standing (which it does not), it does not enjoy the rights it claims as a matter of law. That is because, throughout its Complaint and Motion for Preliminary Injunction, the Plaintiff conflates (1) its own constitutional rights with (2) those of inmates. Proper analysis, however, requires that these interests be scrupulously separated because whatever constitutional rights inmates might have, they are entirely irrelevant to this litigation. Accordingly, the Plaintiff must show that the Defendant's policy violates the First Amendment protections applicable to the Plaintiff's "news gathering" activities. *See Branzburg v. Hayes*, 408 U.S. 665, 707 (1972).

In this context, it is true that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 682. Importantly, though, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting that "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow."). Accordingly, "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684.

As the Plaintiff concedes in its Memorandum of Law, these principles have led the Supreme Court to uphold the "discretion of prison officials to approve or deny physical entry into

14

facility".  *See* ECF No. 4-1 at p. 16 citing *Pell v. Procunier*, 417 U.S. 817 (1974).  The *Pell* decision, however, goes much farther than suggested by the bland parenthetical included in Plaintiff's memorandum.  In *Pell*, the Supreme Court addressed a constitutional challenge to a California Department of Corrections policy that prohibited media interviews with specific inmates.  The policy at issue provided that "press and other media interviews with specific individual inmates will not be permitted".  *Id.* at 819.  After being denied access to three specific inmates for purposes of an interview, three reporters challenged this regulation.  *See id.* at 820.  These media plaintiffs asserted that "face-to-face interviews with specifically designated inmates is such an effective and superior method of newsgathering that its curtailment amounts to unconstitutional state interference with a free press." *Id.* at 833.  The Court expressly rejected this proposition holding that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Id.* at 834.

In *Saxbe v. Wash. Post Co.*, 417 U.S. 843 (1974), a companion case to *Pell*, "a major metropolitan newspaper and one of its reporters…challenge[d] the constitutionality of…the Federal Bureau of Prisons… regulation [which] prohibited any personal interviews between newsmen and individually designated federal prison inmates." *Id.* at 844.  Although the lower courts attempted to balance the First Amendment interests of the press with the penological interests advanced by the policy, the Supreme Court held that such a balancing test was unnecessary and inappropriate.  According to the Court,

> it is unnecessary to engage in any delicate balancing of such penal considerations against the legitimate demands of the First Amendment. For it is apparent that the sole limitation imposed on newsgathering by Policy Statement 1220.1A is no more than a particularized application of the general rule that nobody may enter the prison and designate an inmate whom he would like to visit, unless the prospective visitor is a lawyer, clergyman, relative, or friend of that inmate.

*Id.* at 849.

15

Since the "policy [did] not place the press in any less advantageous position than the public generally … [the case was] constitutionally indistinguishable from *Pell v. Procunier*…and thus fully controlled by the holding in that case." *Id.* at 849-850 (internal citations omitted). Accordingly, the Supreme Court extended its holding in *Pell* to conclude that "[t]he proposition 'that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally . . . finds no support in the words of the Constitution or in any decision of this Court.'" *Id.* at 850, quoting in part *Pell*, 417 U.S. at 834-835.

The Supreme Court reiterated and affirmed its decisions in *Pell* and *Saxbe* in a third case addressing media rights in the prison context. In *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), the Court further established that the restrictions on access countenanced by *Pell* and *Saxbe* extended to interview methodology. The media Plaintiffs in *Houchins* claimed that the First Amendment protected their right to "interview inmates and make sound recordings, films, and photographs for publication and broadcasting by newspapers, radio, and television." *Id.* at 3. "They further asserted that television coverage of the conditions in the cells and facilities was the *most effective way* of informing the public of prison conditions." *Id.* at 4 (emphasis added). In declining to accept this contention, the Court observed that the media was able to learn about jail conditions in a variety of ways other than by recorded interviews with inmates:

> [Media] [r]espondents have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions. Respondents are free to interview those who render the legal assistance to which inmates are entitled. They are also free to seek out former inmates, visitors to the prison, public officials, and institutional personnel, as they sought out the complaining psychiatrist here.

*Id.* at 15 (citations omitted).

The Court concluded that:

> Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. Under our holdings in *Pell v. Procunier, supra,* and *Saxbe v. Washington Post Co., supra,* until the political branches decree otherwise, as they are free to do, the media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally.

*Id.* at 15-16.

In the instant case and similar to the media plaintiffs in *Pell* and *Houchins*, the Plaintiff complains that the Defendant's policy precludes its preferred method for news gathering.  *See* ECF No. 4-1 at p. 10 ("A story *about* Marion Bowman…is not equivalent to a story *by* Marion Bowman.") (emphasis in original).  In other words, Plaintiff insist that written communications from an inmate are a constitutionally inadequate substitute for audio or video recordings of the same prisoner.  This argument is no different from the assertion in *Pell* that "face-to-face interviews with specifically designated inmates" were required by the First Amendment even though "the medium of written correspondence afford[ed] inmates an open and substantially unimpeded channel for communication with persons outside the prison, including representatives of the news media" and "inmates [had] an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison".  *Pell*, 417 U.S. at 824-25.  Furthermore, *Houchins* specifically rejected the proposition that access restrictions on recordings were significant from a constitutional perspective.  Since the same "alternative avenues of communication" discussed in *Pell* and *Houchins* are available to the Plaintiff in the instant case, there is no impermissible restriction on its news gathering as a matter of law.

As noted above, the regulation at issue applies to "anyone".  Accordingly, the general public does not enjoy a means of access to inmates that is superior to that permitted for journalists or advocacy groups.  In other words, the policy does not put the Plaintiff "in any less

advantageous position than the public generally".  Therefore, *Pell*, *Saxbe* and *Houchins* mandate the dismissal of the Plaintiff's claims.

## III.    PRELIMINARY INJUNCTION IS INAPPROPRIATE

The Court should dismiss this case for the reasons described above.  But the Plaintiff has also sought temporary injunctive relief, which should also be denied.

In support of its request for a preliminary injunction, the Plaintiff correctly cites *Winter v. NRDC, Inc.*, 555 U.S. 7  (2008), for the proposition that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  Notably, that decision also opined that:

> A preliminary injunction is an extraordinary remedy never awarded as of right.
> *Munaf*, 553 U.S., at 689-690, 128 S. Ct. 2207, 171 L. Ed. 2d 1. In each case,
> courts "must balance the competing claims of injury and must consider the effect
> on each party of the granting or withholding of the requested relief." *Amoco
> Production Co.*, 480 U.S., at 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542.

*Id.* at 24.

Accordingly, the Court cautioned against too much leniency in evaluating the Plaintiff's burden and stressed the need for consideration of the "overall public interest", *i.e.,* including the public interest in the furtherance of the government's mission.  *See id.* at 27-28 and 34-35.

The proper application of the *Winter* factors is demonstrated by a recent First Amendment case from this circuit, *Roswell v. Mayor*, 671 F. Supp. 3d 607 (D.Md. 2023), aff'd 2023 U.S. App. LEXIS 33595 (4th Cir. December 19, 2023) (per curiam).  To wit:

> The Court cannot issue a preliminary injunction absent a "clear showing" that all
> four requirements are satisfied. *Leaders of a Beautiful Struggle v. Balt. Police
> Dep't*, 979 F.3d 219, 226 (4th Cir. 2020), rev'd on other grounds, 2 F.4th 330 (4th
> Cir. 2021); accord *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The
> plaintiff "bears the burden of establishing that each of these factors supports
> granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d

802, 812 (4th Cir. 1991) (citation omitted). Thus, a court need not address all four *Winter* factors if one or more of those factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

In addition, the movant must show more than a "grave or serious question for litigation"; instead, the moving party bears the "heavy burden" of making a "clear showing" that he satisfies all four factors. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009); *see also Int'l Bhd. of Teamsters v. Airgas, Inc.*, 239 F. Supp. 3d 906, 912 (D. Md. 2017).

*Id.* at 616.

The Plaintiff, however, contends that it is exempt from these rigorous burdens since this case involves a government restraint on its speech.

As discussed above, any restraint on the Plaintiff, as opposed to a restraint on inmates, actually involves its news gathering activities.  These limitations on access to prisoners are clearly not the type of "content-based speech restriction" which led to the results in decisions such as *United States v. Playboy Entm't Group*, 529 U.S. 803 (2000).  *See id.* at 816 (prohibition of daytime broadcast of sexually explicit material); *Reno v. ACLU*, 521 U.S. 844, 879 (1997) (Communications Decency Act internet restrictions).  Therefore, when the issue is properly focused on the nature of the rights at issue, the Plaintiff does not merit the lenient probative burden suggested by its briefing.

### a.  Likely Success on the Merits

For the reasons discussed in Section II above, the Plaintiff is not likely to prove that its organizational constitutional rights have been violated.  Rather, binding Supreme Court precedent explicitly holds that information gathering organizations have no greater right of access to inmates or to record their speech than does the general public.  Thus, the Plaintiff has little or no chance of success on the merits.

Neither is this conclusion altered if the rights of inmates, as opposed to the organization, are considered.  In this context, the Plaintiff asserts that:

> Although the general test for evaluating limitations on fundamental rights in prisons is found in *Turner v. Safley*, 482 U.S. 78, 84 (1987), the applicable standard for outgoing communications from prison is found in *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974).

ECF No. 4-1 at p. 13.

This overlooks the recognition by the *Martinez* Court that "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners", *id.* at 409[4], and the approval of access and recordation limitations by *Pell*, *Saxbe* and *Houchins* as consistent with that prior decision. In other words, if there was an open question following *Martinez* as to whether such restrictions invaded the First Amendment rights of recipients of information, it was answered in the negative by that subsequent trilogy of opinions.

Furthermore, in the very decision cited by the Plaintiff for this proposition, *Thornburgh v. Abbott*, 490 U.S. 401 (1989), the Supreme Court acknowledged that "the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning *outgoing correspondence*." *Id*. at 413 (emphasis added). Obviously, there are significant differences in the security concerns and other burdens posed by outgoing "communications" and by outgoing "correspondence".  For this reason, SCDC inmates are free to correspond with the general public, but not to engage in recorded interviews with anyone.  Since, as recognized by *Turner* and *Thornbugh*, "*Martinez* was too readily understood as failing to afford prison officials sufficient discretion to protect prison security", *id.* at 413, it would be a mistake to extend its otherwise limited application.

---

[4] *See also Turner*, 482 U.S. at 15 ("The *Martinez* Court based its ruling striking down the content-based regulation on the First Amendment rights of those who are not prisoners….").

Based on the foregoing, the impact of the Defendant's policy on its inmates' rights must be addressed under the more deferential standard of *Turner*.  In that decision, the Supreme Court reasoned that:

> "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  [*Martinez]*, at 405.  As the *Martinez* Court acknowledged, "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Id.*, at 404-405. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.  Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities.  *See id.*, at 405.

*Turner,* 482 U.S. at 14.

Due to these concerns, *Martinez* "expressly reserved the question of the proper standard of review to apply in cases 'involving questions of prisoners' rights'" and subsequent "'prisoners' rights' cases did [not] apply a standard of heightened scrutiny".  *Id.* at 16 and 18, quoting in part *Martinez*, 416 U.S. at 409.

Given this precedential background, the *Turner* Court moved to finally resolve the issue left open by *Martinez*.  In its words:

> when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.  In our view, such a standard is necessary if "prison administrators…, and not the courts, [are] to make the difficult judgments concerning institutional operations."  Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand.  Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Turner*, 482 U.S. at 22-23 (citations omitted).

The *Turner* court "identified four factors to consider when assessing a policy's reasonableness: (1) whether a 'valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it,' (2) whether 'alternative means of exercising the right [exist] that remain open to prison inmates,' (3) what 'impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally,' and (4) whether there was an 'absence of ready alternatives' to the regulation in question." *Murdock v. Thompson*, 2022 U.S. App. LEXIS 33198, *15-16 (4th Cir. December 1, 2022), quoting in part *Turner*, 482 U.S. at 89-90.

### i. *Legitimate Governmental Interest*

As to this factor, the Plaintiff relies almost exclusively on media statements by the current Director in the context of protecting victims of crime. This reliance is misplaced because it overlooks the fact that the regulation in question has been in effect for decades—long before Director Stirling assumed his current post. Accordingly, his recent comments to the press have little relevance to the reasons underlying the adoption of this policy.[5]

Rather, SCDC's prohibition on personal contact interviews are principally predicated on various security and institutional objectives. Specifically, these restrictions are needed to avoid the following consequences:

1. disruption to the orderly operation of prisons;

2. drain on prison staffing;

3. security risk due coded messages to criminal associates;

---

[5] This is not to suggest that the protection of crime victims is not a legitimate governmental interest. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982).

4. risk of institutional violence should a rival group or gang take offense to statements;

5. potential for encouraging violence through incendiary speech;

6. lack of sensitivity for any outside crime victims;

7. potential exposure of sensitive information on internal and external security procedures and planned activities;

8. risk of impact on other ongoing litigation;

9. detrimental impact on rehabilitation efforts; and

10. potential for an inmate to develop celebrity status that contributes to management and control problems within the inmate population.

*See* Affidavit of Bryan Antonelli at ¶¶ 5 and 6.

Notably, the legitimacy of many of these objectives has been expressly recognized by the U.S. Supreme Court. *See Thornburgh v. Abbott*, 490 U.S. at 412 (limitation of "potential for coordinated disruptive conduct" and disorder among the prison population arising from "inferences about their fellow [inmates's] beliefs, sexual orientation, or gang affiliations"); *Turner*, 482 U.S. at 26-28 (prevention of the communication of escape plans and arrangement of assaults and other violent acts; reduction of the risk of "coordinated criminal activity" by limiting communication between gang members; and deterrence of the "development of informal organizations that threaten the core functions of prison administration"); *Saxbe v. Wash. Post Co.*, 417 U.S. at 848-849 (preventing inmates from becoming "conspicuously publicized because [they] tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison"); *Pell*, 417 U.S. at 823, 827 and 831-32 (promotion of "the rehabilitation of those committed to its custody"; "keeping visitations at a manageable level"; and limiting inmates from becoming "virtual 'public figures' within the prison society and gain[ing] a disproportionate degree of notoriety and influence among their fellow inmates [which can lead to]

severe disciplinary problems."). Furthermore, as discussed above, these same decisions establish that the limitations at issue in this instant case are reasonably related to these concerns. Thus, first *Turner* factor is clearly present in this case.

### ii. *Alternative Means of Communication*

Clearly, SCDC inmates have alternative means to communicate their words and ideas to the Plaintiff. As noted by the Supreme Court in *Pell*, "the medium of written correspondence affords inmates an open and substantially unimpeded channel for communication with persons outside the prison, including representatives of the news media" and "inmates have] an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison". *Pell*, 417 U.S. at 824-25. These methods were effectively utilized in the coverage of 2018 Lee prison riots by the *The Post & Courier*.[6] In fact, this paper included a photograph of an inmate's letter in an article.

---

[6] In an article entitled "How we reported this project", *The Post & Courier* represented that "the reporting team wrote letters to more than 400 current and former inmates, mostly men housed at Lee during the killing spree….Reporters were able to communicate with more than 100 inmates through letters, emails, text messages and phone calls." In addition, "a team of three reporters…interviewed more than 150 state officials, experts, attorneys, current and former corrections officers and inmates — including direct witnesses to the violence." https://www.postandcourier.com/news/how-we-reported-this-project/article_faf7d5e6-16c6-11ea-9553-ab3bab2abf8d.html.

An inmate who was injured in the violence describes what happened in a letter to The Post and Courier.

Andrew J. Whitaker/ Staff[7]

Given the Supreme Court's explicit approval of these "alternative avenues of communication", there can be no question that this factor militates against the Plaintiff's likelihood of success on the merits.

### iii. Impact of Accommodation

*Turner* also requires the consideration of the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Murdock*, 2022 U.S. App. LEXIS 33198, *15-16.  As to the impact on guards and other inmates, the security concerns addressed in subsection i above powerfully demonstrate the potential risks.  *Turner* itself also illustrates the impact on prison resources.  In the view of that Court:

> the only alternative proffered by the claimant prisoners, the monitoring of inmate correspondence, clearly would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals.  Prison officials testified that it would be impossible to read every piece of inmate-to-inmate correspondence, and consequently there

---

[7] https://www.postandcourier.com/news/how-flaws-in-the-sc-prison-system-led-to-7-deaths-in-a-single-night/article_9e0692d6-104b-11ea-8bc4-cbef2dd3c981.html

would be an appreciable risk of missing dangerous messages. In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages. The risk of missing dangerous communications, taken together with the sheer burden on staff resources required to conduct item-by-item censorship supports the judgment of prison officials that this alternative is not an adequate alternative to restricting correspondence.

*Turner*, 482 U.S. at 81.

Clearly, the necessity of monitoring interviews in real-time, as opposed to reading correspondence at one's own pace when time presents, increases both the burden on the institution and the probability of missing dangerous messaging. Furthermore, while a letter can be redacted before its receipt, an oral statement cannot be "unheard". Thus, this factor also supports the Defendant's position.

### iv. *Absence of Ready Alternatives*

As the *Turner* court held, "the absence of ready alternatives [to a regulation in question] is evidence of the reasonableness of a prison regulation." *Turner* at 90. For the same reasons discussed above, there are no available alternatives to the current policy apart from the live monitoring of interviews by trained prison personnel. Since the efficacy of such efforts is questionable at best, there are no "ready alternatives". Accordingly, the Plaintiff's "proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh*, 490 U.S. at 407. Therefore, the regulation at issue clearly passes muster under the *Turner* test and the Plaintiff cannot establish its likelihood of success on the merits.

### b. *Likely Irreparable Harm*

Under *Winter* and its progeny, "it [is] unnecessary to address all four factors when one or more [has] not been satisfied." *Henderson,* 902 F.3d at 439, citing *Winter*, 555 U.S. at 23-24. In the instant case, Plaintiff's inability to demonstrate likely success on the merits alone is dispositive

of its claim for injunctive relief.  For the sake of good order, however, the Defendant will briefly address the remaining three parts of the relevant standard.

As to a "likely irreparable injury", the Plaintiff's argument is limited to the conclusory statement that "a First Amendment injury is "unquestionably" irreparable".  ECF No. 4-1 at p. 10, citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).  Courts have cautioned, however, that Plaintiff should not "cite *Elrod* and simply claim victory."  *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 83 (D.C.Cir. 2012).  Once again, the injury must be to the Plaintiff's ongoing news gathering activities, not to the rights of inmates.  Plaintiff has not carried its burden that potential future restrictions on its access to inmates will likely result in such harm.

### c.  *Public Interest/Balance of Equities*[8]

The Plaintiff also relies on a single phrase and citation in an effort to satisfy its proof of these requisite elements.  *See* ECF No. 4-1 at p. 10 ("both the public interest and balance of equities are 'established when there is a likely First Amendment violation,' *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).).  Contrary to this glib conclusion, even First Amendment "plaintiffs must establish, separately from any showing of irreparable harm, that the 'balance of equities' weighs in their favor. In determining whether plaintiffs have made that showing, '[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Sarsour v. Trump*, 245 F. Supp. 3d 719, 740 (E.D.Va. 2017), quoting in part *Winter*, 555 U.S. at 24.  Here the remote impact of the

---

[8] "[T]he balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'" *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020).

Plaintiff's limited access to inmates runs counter to the safety concerns to inmates and guards and other harm which could flow from the elimination of these regulations.

"When considering the public interest, the Court 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Ass'n of Am. Publrs., Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D.Md. 2022), quoting *Winter* at 24.   In this case, the public's interest in the safe and effective operation of its corrections system is coupled with its interest in preventing inmates from directing criminal activity against citizens from within the prison itself.   Similarly, the public has a reasonable interest in protecting crime victims from invasions of privacy and psychological harm.   As the outcome of this delicate balancing exercise is far from certain, the Plaintiff has not made a clear showing that it tilts in its favor.    Based on the foregoing, the extraordinary relief of a preliminary injunction is not warranted in this case.

## CONCLUSION

As noted above, "[t]he standing requirement is designed to guarantee that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate."   *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008), quoting *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 298 (4th Cir. 2005).   When artful pleading is distinguished from actual facts, it is clear that the Plaintiff lacks the requisite personal stake in the form of an injury in fact to the organization which is traceable to nonspeculative government conduct and redressable by a favorable ruling herein.   As such it lacks the constitutional standing necessary to pursue this claim.

In addition, the established caselaw demonstrates that the Plaintiff has no legal right to the relief requested under the facts as pleaded.   Accordingly, this matter must be dismissed in its entirety.

Finally, the Plaintiff's request for a preliminary injunction flies in the face of four decades of settled Supreme Court authority.  Therefore, it is inconceivable that Plaintiff can establish a likelihood of success on the merits, and this relief must be denied.

Respectfully submitted

WOMBLE BOND DICKINSON (US) LLP

By: /s/ Kevin A. Hall
Federal Bar No. 5375
kevin.hall@wbd-us.com
M. Todd Carroll
Federal Bar No. 9742
todd.carroll@wbd-us.com
1221 Main Street, Suite 1600
Columbia, South Carolina 29201
803.454.6504

David M. Collins
Federal Bar No. 223
david.collins@wbd-us.com
5 Exchange Street
Charleston, South Carolina 29401
843.722.3400

*Attorneys for Defendant Bryan Stirling, in his official capacity as Executive Director of the South Carolina Department of Corrections*

April 2, 2024