# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

AMERICAN CIVIL LIBERTIES UNION OF SOUTH
CAROLINA;

          *Plaintiff*,

    v.

BRYAN STIRLING, in his official capacity as
Executive Director of the South Carolina
Department of Corrections;

          *Defendant*.

Case No. 3:24-cv-00906-JDA

## **Plaintiff's Opposition to Defendant's Motion to Dismiss**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

LEGAL STANDARD...............................................................................................................2

ARGUMENT .............................................................................................................................4

    I.    Plaintiff ACLU-SC has standing. ...........................................................4

        A.    ACLU-SC is injured-in-fact by Defendant's prohibition on publishing prisoner speech.........................................................5

        B.    ACLU-SC's injury is traceable to Defendant Stirling. .............................12

        C.    ACLU-SC's injury is redressable by this Court. .......................................13

        D.    ACLU-SC's discussion of the rights of prisoners does not undermine its Article III standing. ................................................13

    II.    ACLU-SC plausibly alleges that SCDC's restrictions on interviewing and publishing the speech of prisoners violates the First Amendment. .......................14

        A.    Plaintiff's Complaint alleges plausible First Amendment claims.............15

        B.    Defendant's Motion to Dismiss erroneously injects his own factual assertions..............................................................................19

        C.    Contrary to Defendant's Motion to Dismiss, ACLU-SC's Complaint does not demand "special access" to prisoners and is not governed by *Pell*, *Saxbe*, or *Houchins*.................................19

CONCLUSION........................................................................................................24

**INTRODUCTION**

Unique among prison systems nationwide, the South Carolina Department of Corrections (SCDC) enforces a blanket ban on all real-time interviews. Even individuals that are allowed to communicate with prisoners in person or by phone (like lawyers) are prohibited from recording conversations with prisoners or publishing their speech. Because the policy forbids Plaintiff ACLU of South Carolina (ACLU-SC) from engaging in specific, planned activities that are core to its mission and protected by the First Amendment, it brought this lawsuit seeking pre-enforcement injunctive relief.

SCDC's ban on interviewing, recording, and publishing prisoner speech directly harms Plaintiff. ACLU-SC seeks to record interviews with two of its clients that are held at SCDC. One of those individuals, Sofia Cano, wants to share her experience of being transgender behind bars and her ongoing journey to receive medically necessary healthcare at SCDC. The other, Marion Bowman, wants to share his more than twenty years of experience on death row, in hopes of drawing greater public attention to the redeemability of death row prisoners and the dehumanizing treatment they endure at the hands of SCDC staff. After interviewing those individuals, Plaintiff wants to publish their speech on the internet in furtherance of its own political advocacy against capital punishment and in defense of transgender South Carolinians.

In moving to dismiss, Defendant Stirling argues that ACLU-SC does not have standing because its injury is not particularized or concrete, and that its decision to self-censor is invalid because "there has been no threat to Plaintiff." ECF 20-1 at 12. But under well-established precedent, ACLU-SC easily satisfies the case and controversy requirement of Article III. It faces a credible threat of enforcement, as shown by the fact that the policy facially applies to its planned conduct. Indeed, even in moving to dismiss, Defendant Stirling does not dispute that SCDC's policy prohibits ACLU-SC's planned activities or that the policy would be enforced against ACLU-SC and its clients. It is therefore objectively reasonable for ACLU-SC to self-censor rather than exposing itself and its clients to punishment under SCDC's policy.

1

Defendant Stirling argues that dismissal is also required because Plaintiff's claim is foreclosed by a trilogy of Supreme Court cases from the 1970s: *Pell*, *Saxbe*, and *Houchins*. But those cases merely held that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public." *Pell v. Procunier*, 417 U.S. 817, 834 (1974); *see also Saxbe v. Wash. Post. Co.*, 417 U.S. 843, 849 (1974); *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978). That holding is irrelevant here, where ACLU-SC has made clear that it "does not seek additional access to its clients; it seeks only to be free from censorship during and after the interview." ECF 4-1 at 22. If anything, those cases *support* Plaintiff's claim. In ruling for the prisons, the Supreme Court highlighted that the challenged policies were tailored to accommodate legitimate security concerns inherent to physical entry into a prison and that the policies left open ample alternatives for real-time communication between prisoners and the press. Neither is true here. SCDC's policy is not grounded in a valid, penological interest; it suppresses the speech of prisoners for the sole purpose of protecting unidentified crime victims from observing the speech and experiencing hypothetical discomfort. SCDC's policy also does not leave open meaningful alternatives for communication. Unlike in *Pell*, *Saxbe*, and *Houchins*, which allowed phone calls and even some in-person interviews with prisoners, SCDC's policy imposes a blanket ban on media access for prisoners.

In short: ACLU-SC is injured-in-fact by SCDC's categorical ban on interviewing, recording, and publishing the speech of incarcerated people. Applying the facts from Plaintiff's Complaint, the policy fails scrutiny under both *Procunier v. Martinez*, 416 U.S. 396 (1974) and *Turner v. Safley*, 482 U.S. 78 (1987). Defendant's Motion to Dismiss is meritless and should be denied.

## LEGAL STANDARD

Defendants seek to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 21 at 1.

Dismissal for lack of jurisdiction under Rule 12(b)(1) is only appropriate where the jurisdictional allegations are "clearly . . . immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946). Moreover, "when the jurisdictional facts and the facts central to a . . . claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). In questions concerning standing, the Court "views the evidence in the light most favorable to the plaintiff and draws all reasonable inferences in its favor." *United States v. Phillips*, 883 F.3d 399, 405 (4th Cir. 2018); *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 165 (4th Cir. 2023) (same); *see also Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1035 (11th Cir. 2022) ("To strip a district court of subject matter jurisdiction, a plaintiff's federal claim must have no plausible foundation or the court must conclude that a prior Supreme Court decision clearly forecloses the claim."). In considering a Rule 12(b)(1) motion to dismiss, the Court may consider evidence outside the pleadings. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

A Rule 12(b)(6) motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses"—rather, it merely "tests the sufficiency of a complaint." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). A court  must "accept[] all well-pleaded allegations in the plaintiff's complaint as true and draw[] all reasonable factual inferences from those facts in the plaintiff's favor." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (citations omitted). Under Rule 12(b)(6), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 678 (2007)).

## ARGUMENT

### I.     Plaintiff ACLU-SC has standing.

ACLU-SC seeks to interview its clients and prospective clients incarcerated in prisons under Defendant's control; record and document their speech; and then publish and disseminate that speech. Credibly believing—based on the unrefuted statements of SCDC officials and employees—that recording and publishing prisoner speech is prohibited by SCDC policy and would trigger punishment for itself and its clients, ACLU-SC filed this pre-enforcement action seeking declaratory and injunctive relief. In response, Defendant Stirling admits that Plaintiff's planned activities are prohibited, but still argues that ACLU-SC is "not injured" by the policy. Both cannot be true.

*Legal Standard*

To demonstrate standing, a plaintiff must show "injury in fact," "traceability," and "redressability." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187–88 (4th Cir. 2018). When standing is challenged, "the Court must assume the Plaintiffs will win on the merits," *Savannah River Site Watch v. U.S. Dep't of Energy*, No. 1:21-cv-1942-MGL, 2023 WL 1802118, at *5 (D.S.C. Feb. 7, 2023) (citing *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)), and "may not dismiss for lack of standing on the theory that the underlying interest is not legally protected," *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013). Additionally, courts must be careful not to "take a cramped view of standing in civil rights cases, lest [they] impair the remedial purpose Congress had in mind when enacting civil rights statutes." *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019). This is particularly true in First Amendment cases, where standing requirements "are somewhat relaxed." *Cooksey*, 721 F.3d at 235; *see also, e.g., Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing.") (citations omitted). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235.

4

Organizations can establish Article III standing in one of two ways. "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representatives of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199–201 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Where, as here, the organization asserts its own standing to sue, "a court conducts the same inquiry as in the case of an individual." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991).

Here, it is beyond dispute that ACLU-SC possesses its own First Amendment rights, *see In re Primus*, 436 U.S. 412, 427–28 (1978), and can vindicate violations of those rights under Section 1983, *see Burwell v. Hobby Lobby*, 573 U.S. 682, 707–08 (2014) (noting that the Dictionary Act definition of "person" under 1 U.S.C. § 1 generally applies to federal statutes and that "corporations" means nonprofit and for-profit corporations). In fact, ACLU affiliates routinely file lawsuits to vindicate their own First Amendment rights. *See, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 593 (7th Cir. 2012) (affirming ACLU's standing to bring First Amendment challenge to law that prohibited its employees from recording the police); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 100–01 (2d Cir. 2003) (affirming ACLU's standing to bring First Amendment challenge to statute that caused it to self-censor materials on its website); *Ind. ACLU v. Ind. St. Police*, 470 F. Supp. 3d 888, 900 (S.D. Ind. 2020) (affirming ACLU's standing to bring First Amendment challenge to law prohibiting its employees from soliciting donations at "Constitution Day" event). The question, then, is whether ACLU-SC has been injured-in-fact by an action that is traceable to Defendant Stirling and is redressable by this Court. Here, it has.

A. ACLU-SC is injured-in-fact by Defendant's prohibition on publishing prisoner speech.

Article III's injury-in-fact requirement is satisfied when a plaintiff alleges "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Webb v. Paine*, 515 F. Supp. 3d 466, 481–82 (S.D.W.Va. 2021)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.'" *Cooksey*, 721 F.3d at 235 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). Here, ACLU-SC easily satisfies that test.

In its complaint, ACLU-SC alleges that SCDC—under the direction of Defendant Bryan Stirling—enforces a categorical prohibition on media interviews for prisoners. ECF 1 at ¶¶ 11–17 ("Complaint"). It alleges that SCDC's policy applies to "anyone" (not just those with press credentials) and that the policy was recently enforced against a lawyer who provided a recording of their client's speech to the media for subsequent publication. *Id.* at ¶¶ 18-21. Enforcement of the policy has resulted in revocation of phone and tablet privileges for the prisoner and the issuance of a threatening letter to the lawyer. *Id.* at ¶ 20. Defendant Stirling concedes these allegations, adding that the interview and subsequent publication of prisoner speech by the lawyer "constituted both a violation of the regulation by the inmate and an abuse of the privilege of free access on the part of his legal representation." ECF 20-1 at 3. As a result, the "attorney was cautioned that his ability to conduct unmonitored telephone conferences with his clients could be jeopardized by further abuses." *Id.*

ACLU-SC also alleges that SCDC's policy causes it a concrete, imminent, and particularized harm. Plaintiff's Complaint identifies two specific clients whom it seeks to interview, the subject matter sought to be discussed, and the purpose for which ACLU-SC seeks to publish its clients' speech. Complaint at ¶¶ 32–48. It further alleges that it has a protected First Amendment right to engage in the planned activities but has refrained from doing so out of an objectively reasonable fear that doing so would result in discipline for it and for its incarcerated clients. *Id.* at ¶ 30 (alleging that ACLU-SC would not have published the speech of Brittany Martin if it believed doing so would result in discipline), ¶¶ 32–48; *see also* ECF 4-2 at ¶¶ 30-33 (Chaney Decl.). As for Marion Bowman, ACLU-SC claims that its need to interview and publish Mr. Bowman's speech is especially pressing because of Mr. Bowman's looming execution.

These factual allegations must all be treated as true, *see Phillips*, 883 F.3d at 405, and the Court must assume at this stage that ACLU-SC has a legal interest in engaging in the planned activities.[1] *Cooksey*, 721 F.3d at 239 ("[W]here the plaintiff presents a non-frivolous legal challenge, alleging an injury to a protected right such as free speech, the federal courts may not dismiss for lack of standing on the theory that the underlying interest is not legally protected.") (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006)); *see also Meese v. Keene*, 481 U.S. 465, 473 (1987) ("[W]hether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis.").

In moving for dismissal, Defendant Stirling advances three arguments for why ACLU-SC's well-pleaded allegations fail to demonstrate "injury-in-fact." On each, Defendant misstates the law and/or mischaracterizes Plaintiff's allegations.

### 1.     ACLU-SC's injury is "particularized."

First, Stirling argues that because SCDC's prohibition on personal contact interviews "applies equally to all members of the public," the injury to ACLU-SC "is not particularized." ECF 20-1 at 10–11. But that argument badly misconstrues what "particularized" means. Within the context of Article III, a "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *see, e.g.*, *Nowlin v. Pritzker*, 34 F.4th 629, 633 (7th Cir. 2022) (affirming dismissal where "the complaint did not contain a single allegation that was specific to a particular plaintiff"). "Particularized" does not mean "unique;" that a law or policy applies to many people—or even *all* people—n eachstanding. If it were, Article III would foreclose all constitutional challenges to laws of general applicability.

---

[1] ACLU-SC's First Amendment right to engage in the planned activities is discussed in Part II.A.2, below.

ACLU-SC does not simply assert a generalized grievance about the constitutionality of SCDC's ban on media access for prisoners. Rather, it alleges that SCDC's policy prohibits ACLU-SC—*in particular*—from engaging in specific, planned, and protected First Amendment conduct. That is more than enough to establish a "particularized" injury. *See, e.g.*, *PETA, Inc. v. Stein*, 737 F. App'x 122, 130 (4th Cir. 2018) (holding that organizational plaintiff "alleged a reasonable and well-founded fear that the Act *will be* enforced against them" where "the Act appear[ed] by its terms to prohibit Plaintiffs' planned activities" and where "defendants have not disputed" that the Act would be enforced against Plaintiffs). Contrary to Defendant's insinuation, ACLU-SC need not allege that it was specifically targeted by state action; it need only allege—as the Complaint does—that the challenged policy affects it in a specific, particularized way.

### 2.     ACLU-SC faces a credible and imminent threat of enforcement under the challenged policy.

Second, Stirling argues that because ACLU-SC already has personal contact access to its clients, it "has not sustained any 'concrete' injury from the regulation which 'actually exists.'" ECF 20-1 at 11. This argument is wrong on the facts and the law.

On the facts, Stirling is correct that ACLU-SC has ready access to its clients. Incidentally, that is why *Pell* and *Saxbe*, which involve plaintiffs who lacked access to prisoners, do not govern this case. *Infra* Part II.C. But ACLU-SC does not seek to vindicate an injury to its access. Rather, ACLU-SC seeks relief from SCDC's suppression of its First Amendment expressive activities *during* and *after* its client meetings. Stirling agrees that SCDC policy prohibits individuals with the "privilege of free access" to record and then publish a "personal contact interview." ECF 20-1 at 3 (discussing punishment of Alex Murdaugh and his attorney). For that reason, ACLU-SC has refrained from that conduct out of a reasonable fear of enforcement.

But even beyond that, Stirling is wrong that ACLU-SC must show an "actual" injury. Article III is satisfied by injuries that are actual *or imminent*. *Lujan,* 504 U.S. at 560. As the Fourth Circuit explained, "[t]he Supreme Court has always described and treated the two

concepts — actual, ongoing injury vs. imminent injury — as disjunctive." *Deal*, 911 F.3d at

188–89. Moreover, "[t]hat 'actual or imminent' is disjunctive is critical: it indicates that a

plaintiff need not wait until he or she has actually sustained the feared harm in order to seek

judicial redress, but can file suit when the risk of harm becomes imminent." *Clemens v.

ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022). In a First Amendment challenge, a plaintiff

has standing when it shows "a non-speculative and reasonable chilling effect of [its] speech" due

to government actions or policies. *Cooksey*, 721 F.3d at 236.

This case presents a routine pre-enforcement challenge. Federal courts allow such claims

so long as plaintiffs allege a "credible threat of enforcement." *Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 164 (2014). In *ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), for

example, the Seventh Circuit evaluated whether the ACLU of Illinois had standing to challenge

an Illinois eavesdropping statute under the First Amendment. *Id.* at 592–94. There, the ACLU

argued that its employees and agents planned to audio record on-duty police officers in public

spaces, that its planned activities were protected under the First Amendment, and that its planned

activities triggered a credible threat of prosecution under the eavesdropping statute. *Id.* Noting

that the state "has not foresworn the possibility" of enforcing the statute against ACLU or its

employees, the Seventh Circuit held that "[t]hese allegations are easily sufficient to establish a

credible threat of enforcement," and that "[n]othing more is needed for preenforcement

standing." *Id.* at 593.

Like the ACLU of Illinois in *Alvarez*, ACLU-SC has plainly alleged a "credible threat of

enforcement." *Susan B. Anthony List*, 573 U.S. at 164. SCDC's public messaging around the

challenged policy is unequivocal—no publication of prisoner speech is allowed. Within the last

year, SCDC threatened an attorney and punished a prisoner for recording and publishing an

interview between a prisoner and their counsel. Given that ACLU-SC intends to do just that, it

has plausibly alleged a "credible threat of enforcement" and thus has established an imminent

"injury-in-fact." *Id.*; *see also Kenny v. Wilson*, 885 F.3d 280, 284 (4th Cir. 2018) ("Past

9

enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical.").

### 3.    ACLU-SC's decision to self-censor is objectively reasonable.

Third, Stirling argues that ACLU-SC's self-censorship is invalid because "there has been no threat to Plaintiff," and the possibility of punishment under the challenged policy applies only to "third parties." ECF 20-1 at 12. But for several reasons, ACLU-SC's self-censorship is an objectively reasonable response to a credible threat of enforcement.

To start, ACLU-SC is not required to show that SCDC specifically threatened it with enforcement. To the contrary, a policy "that facially restricts expressive activity by the class to which the plaintiff belongs presents a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary." *N.C. Right to Life v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999). Here, SCDC officials publicly announced on August 30, 2023, that "inmates lose the privilege of speaking to the news media when they enter SCDC." Complaint at ¶ 17. Defendant Stirling further clarified that the policy is "rooted in victims' rights," and is designed to protect crime victims from encountering prisoner speech. *Id.* at ¶ 16. Plaintiff's planned activities, which include the widespread publication of prisoner speech, plainly trigger a credible threat of enforcement under that policy. Moreover, the threat of enforcement is "especially credible" when defendants—as here—have not disavowed enforcement against plaintiff. *See generally* ECF 21 (opposing Plaintiff's planned activities). Because Plaintiff's Complaint credibly alleges that its planned activities would trigger enforcement under SCDC's broad, categorical policy, it has shown that its self-censorship is objectively reasonable. *See Speech First, Inc. v. Sands*, 69 F.4th 184, 193 (4th Cir. 2023) ("[A] credible threat of enforcement is the *sine qua non* of a speech chilling claim.") (citing *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)), *vacated on other grounds by Speech First, Inc. v. Sands*, 144 S. Ct. 675 (Mar. 4, 2024).

Moreover, ACLU-SC is not self-censoring merely to avoid punishment of its incarcerated clients. To the contrary, ACLU-SC alleges that *it* faces punishment under the challenged policy.

10

*See* Complaint at ¶ 3. This allegation must be presumed true, *see Menders*, 65 F.4th at 165, and is corroborated by the threatening letter that SCDC sent to attorney Jim Griffin for engaging in similar conduct, *see* Complaint at ¶ 21; *see also* ECF 20-1 at 3. As Defendant well knows, ACLU-SC routinely represents SCDC prisoners, and retaliation against ACLU-SC's access to its client would materially disrupt those activities.

Moreover, the type of punishment faced by prisoners for violating SCDC's anti-speech policy directly injures ACLU-SC. When SCDC punished Alex Murdaugh for having his speech published, it did so by revoking Murdaugh's tablet and phone privileges. Complaint at ¶ 20. As Defendant Stirling knows, SCDC prisoners use their tablet to, among other things, contact their attorneys. ACLU-SC's client Sofia Cano, for example, routinely uses her tablet to reach out to her legal team about legal matters. Therefore, revocation of a prisoner's tablet and phone privileges does not just hurt the prisoner—it also interferes with the attorney-client relationship by making communication more difficult. *See Canadian Coal. Against Death Penalty v. Ryan*, 269 F. Supp. 2d 1199, 1201 (D. Ariz. 2003) ("Although actual enforcement of HB 2376 is directed at prisoners, Plaintiffs [advocacy organizations] have standing to challenge HB 2376's limiting effects on the circulation of their message.") (*citing Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 n.6 (1963)).

Finally, even if ACLU-SC's self-censorship was only to avoid unjust punishment of its incarcerated clients, it would still have standing. In *Webb v. Paine*, 515 F. Supp. 3d at 481–82, the plaintiff was a lobbyist who "decided to not identify or mention the [West Virginia Department of Education] or its officials in social media posts" out of fear that WVDE would retaliate against his client, who was seeking a government contract for standardized testing. Specifically, Webb alleged that the defendants' conduct "caused him to fear how his client would be treated by WVDE and because of that concern, he decided to [self-censor]." *Id.* The court agreed that "[t]his kind of chilling, . . . represents an actual, particularized, and concrete invasion into [Plaintiff's] First Amendment rights." *Id.* at 482. So too here.

B.  ACLU-SC's injury is traceable to Defendant Stirling.

Defendant Stirling does not dispute that he is the official charged with enforcing the challenged policy. *See generally* ECF 20-1; *cf. Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901–02 (4th Cir. 2022) ("When a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury allegedly caused by that law is not traceable to the defendant."). Rather, he argues that ACLU-SC's injuries are not "traceable" because Plaintiff's injuries are "self-inflicted." ECF 20-1 at 13.[2]

The Supreme Court rejected that exact argument in *Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022). There, the Government argued that the plaintiffs—among them, Senator Ted Cruz— lacked standing because their injuries were "self-inflicted" and, as a result, "any resulting injury is in essence traceable to *them*, not the Government." *Id.* at 296 (emphasis in original). In the district court, Senator Cruz even stipulated that his "sole and exclusive motivation behind . . . making the 2018 loan[s] and the [C]ommittee's actions in waiting to repay them was to establish the factual basis for this challenge." *Id.* Even against that admission, the Court rejected the Government's argument root and branch, writing:

> We have never recognized a rule of this kind under Article III. To the contrary, we have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred.

*Cruz*, 596 U.S. at 297.

So too here. As discussed, ACLU-SC faces a credible threat of enforcement under the challenged policy. *Supra* Part I.A. It intends to record and publish the speech of its incarcerated clients. As Defendant Stirling admits in his joint Motion to Dismiss and Opposition to Preliminary Injunction, such conduct has been punished before. Even if the decision to self-

---

[2] Defendant Stirling also denies traceability on grounds that the challenged policy is "directed at inmates, not the Plaintiff." ECF 20-1 at 13. This argument is addressed in the "injury-in-fact" section of this brief. *See supra* Part I.A.

12

censor rather than expose itself to punishment is "in some sense [] willingly incurred," it is still "traceable" to the SCDC policy enforced by Defendant Stirling. *Cruz*, 596 U.S. at 297.

C.  ACLU-SC's injury is redressable by this Court.

"An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The burden to establish redressability "is not onerous": the plaintiff need only "show that [he] personally would benefit in a tangible way from the court's intervention." *Deal*, 911 F.3d at 189 (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)).

Here, ACLU-SC's injury is plainly redressable. At present, ACLU-SC is refraining from recording and publishing interviews with its incarcerated clients out of fear that SCDC will punish it and its clients under the challenged policy. If the policy is enjoined, ACLU-SC will be able to engage in its planned activities without fear of punishment. Without question, such an order "would benefit [ACLU-SC] in a tangible way." *Deal*, 911 F.3d at 189.

D.  ACLU-SC's discussion of the rights of prisoners does not undermine its Article III standing.

Defendant Stirling devotes an entire section of his brief to arguing that ACLU-SC "cannot rest [its] claim to relief on the legal rights or interests of third parties." ECF 20-1 at 7–9; *see also id.* at 14 (erroneously arguing that the rights of incarcerated people "are entirely irrelevant to this litigation").[3] But Stirling's argument confuses standing, which is established by the challenged policy's application to ACLU-SC's planned activities, *see supra*, with the merits

_____

[3] Defendant Stirling cites five specific examples of the Complaint "referenc[ing] or allud[ing] to alleged harm to inmates or other third parties." ECF 20-1 at 7. Paragraphs 20 and 21 discuss SCDC's enforcement of its policy against Murdaugh, which explains the scope and application of SCDC's policy and underscores the credible threat of enforcement against ACLU-SC's planned activities. *Supra* Part I.A. Paragraph 30 states that ACLU-SC would not have published its interview with Brittany Martin if she was held at SCDC and subject to punishment under the challenged policy. Paragraphs 50 and 51, which are part of ACLU-SC's facial challenge, are the only paragraphs that explicitly invoke the rights of third parties.

13

of ACLU-SC's overbreadth challenge, which *requires* an analysis of the rights of others. Complaint at ¶¶ 5, 55; *see United States v. Hansen*, 599 U.S. 762, 770 (2023).

A statute, policy, or regulation is overbroad under the First Amendment "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 599 U.S. 460, 473 (2010) (internal quotation marks omitted); *see also, e.g., Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005) (applying doctrine of overbreadth to prison's media policy). "To judge whether a statute is overbroad, [the Court] must first determine what it covers." *Hansen*, 599 U.S. at 770; *see also United States v. Williams*, 553 U.S. 285, 292 (2008) ("[I]t is impossible to determine whether a law reaches too far without first knowing what the law covers."). As the Supreme Court reaffirmed just last term, "the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 769–70 (citing *Williams*, 553 U.S. at 292). In that way, overbreadth represents a departure from the general rule that "litigants typically lack standing to assert the constitutional rights of third parties." *Id*. at 769 (citing *Powers v. Ohio*, 499 U.S. 400, 410 (1991)).

ACLU-SC's overbreadth challenge *requires* the Court to evaluate the rights of third parties (here, prisoners) to determine whether the challenged policy "reaches too far." *Williams*, 553 U.S. at 292. If it does, the policy must be struck down in its entirety. Under well-established precedent, discussing the rights of third parties does not affect ACLU-SC's standing.

## II.     ACLU-SC plausibly alleges that SCDC's restrictions on interviewing and publishing the speech of prisoners violate the First Amendment.

ACLU-SC alleges that SCDC enforces a categorical prohibition on media access for prisoners. Complaint at ¶¶ 1–2. The policy not only prohibits members of the press from interviewing prisoners, but it also prohibits attorneys, friends, and family members from interviewing prisoners and then publishing that speech. *See, e.g.*, *id.* at ¶¶ 2, 18–21. Further, ACLU-SC alleges that SCDC enforces the policy to prevent crime victims from being exposed to incarcerated persons' speech and *not* because of any security or administrative concern. *Id.* at ¶¶

14

15-17. Finally, ACLU-SC alleges that the challenged policy restricts far more speech than is necessary to accommodate SCDC's claimed interest in protecting crime victims from speech that could theoretically upset them. *Id.* at ¶¶ 5, 55. These allegations are sufficient to support ACLU-SC's claims that the policy is facially unconstitutional, *see id.* at ¶¶ 50–58, and violates the First Amendment rights of ACLU-SC as applied to its planned activities, *id.* at ¶¶ 62–64.

    A. <u>Plaintiff's Complaint alleges plausible First Amendment claims.</u>

        **1.**       **On its face, the challenged policy is overbroad and suppresses a substantial amount of protected speech.**

ACLU-SC's standing is established by its own injury, *supra* Parts I.A, D, but its facial challenge requires the Court to evaluate the policy's burden on the First Amendment rights of others, including prisoners. *See Hansen*, 599 U.S. at 769–70; *Procunier v. Martinez*, 416 U.S. 396, 413–14 (1974) (holding that a restriction on prisoner speech is "invalid if its sweep is unnecessarily broad").

Restrictions on outgoing prisoner speech are governed by *Martinez*. *See Thornburgh v. Abbott*, 490 U.S. 401, 412–13 (1989). Under *Martinez*, a prison must show that its restriction on outgoing prisoner correspondence (1) furthers an important or substantial governmental interest unrelated to the suppression of expression; and (2) that the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved. *Martinez*, 416 U.S. at 413–14.

As stated in the Complaint, SCDC's policy is "rooted in victims' rights," and is justified by Defendant Stirling's position that "we don't think victims should have to see the person who harmed them or their family members on the evening news." Complaint at ¶ 16; *see also* ECF 4-4 (SCDC Press Release). Given that both the flow of information (from prisoners to non-prisoners) and locus of alleged harm (crime victims) are outside the prison walls, the policy must satisfy *Martinez*.

Accepting Plaintiff's allegations as true, the challenged policy fails *Martinez*. As discussed in Plaintiff's Motion for Preliminary Injunction, protecting victims from upsetting

speech is not, as a matter of law, a legitimate penological interest that can justify a blanket restriction of prisoner speech. *See* ECF 4-1 at 14–15. Rather, courts have limited the range of substantial government interests in this context to "security, order, and rehabilitation." *Id.* (citing *Martinez*, 416 U.S. at 413). Furthermore, *Martinez* made clear that "[p]rison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions." *Martinez*, 416 U.S. at 413. Yet that is exactly what SCDC's policy purports to do.

       SCDC's policy also fails the second prong of *Martinez*. Even if SCDC's policy were predicated on a substantial interest in "security, order, and rehabilitation," it still lacks the close fit required by the First Amendment. *See id.* (demanding that the restriction on speech be "no greater than is necessary or essential to the protection of the particular governmental interest involved"); *Thornburgh*, 490 U.S. at 411 ("*Martinez* required a close fit between the challenged regulation and the interest it purported to serve."). As explained in Plaintiff's Motion for Preliminary Injunction, the challenged policy is an extreme outlier compared to other prisons. ECF 4-1 at 15–16 (citing *Holt v. Hobbs*, 574 U.S. 352, 368–69 (2015) ("That so many other prisons allow [the challenged activity] . . . suggests that the Department could satisfy its security concerns through a means less restrictive.")); *see also* ECF 4-12 (Nationwide Survey of Prison Media Policies). Indeed, many other prison systems have developed less restrictive alternatives for protecting crime victims from upsetting prisoner speech. *Id.*; *see, e.g.*, ECF 4-12 at 62 (Alaska), 186 (Kentucky), 198 (Maine). The policy is also both over- and underinclusive. It is overinclusive because it suppresses a substantial amount of speech that has no likelihood of offending a victim. *See* ECF 4-1 at 16–17 (noting that SCDC's policy prohibits *all* prisoner speech in the media "irrespective of the existence, involvement, or attitude of the associated victim"). But it is also underinclusive because SCDC has demonstrated a willingness to eschew its own commitment to "victim rights" and provide recordings of prisoner phone calls directly to the media. ECF 4-1 at 18; ECF 4-9 (FITS News article).

Given that the challenged policy is not justified by "security, order, or administration" and is fatally over- and underinclusive with respect to its stated interest, the policy (as described in Plaintiff's Complaint) is overbroad and thus facially violates the First Amendment.

> **2.     As applied to ACLU-SC's planned activities, the challenged policy violates the First Amendment.**

The unconstitutionality of the challenged policy is even clearer as applied to ACLU-SC. ACLU-SC enjoys free access to its incarcerated clients both as a matter of fact, *see* Complaint at ¶¶ 35, 44, and under the First Amendment, *see In re Primus*, 436 U.S. at 427–28. But despite permitting access, SCDC categorically and unjustifiably prohibits ACLU-SC from exercising its First Amendment rights to record and publish its clients' speech out of a vague concern that the speech might, if publicized, potentially offend a crime victim. *See* ECF 20-1 at 20 ("SCDC inmates are free to correspond with the general public but not to engage in recorded interviews with anyone.").  Thus, the policy does not regulate access to incarcerated people; it targets only their speech.

To Plaintiff's knowledge, SCDC is the only prison system in the nation to enforce a policy like this. As a result, courts have not spoken on this precise issue. That said, *Alvarez*, discussed above for its relevance to standing, is also useful for understanding the First Amendment rights at issue. In *Alvarez*, the ACLU of Illinois claimed a First Amendment right to record police officers in public view. In evaluating its claim, the Seventh Circuit agreed that "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Id.* at 595; *see also Near v. Minnesota*, 283 U.S. 697, 713–14 (1938) ("Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press.") (quoting 4 Bl. Com. 151, 152). By prohibiting audio recordings, "the eavesdropping statute restricts a medium of expression—the use of a common instrument of communication—and thus an integral step in the speech process." *Alvarez*, 679 F.3d at 600; *see also Glik v. Cunniffe*, 655 F.3d 78, 79–81 (1st Cir. 2011)

17

(holding that "case law from this and other circuits" demonstrates that the right to record the police is "clearly established").

After concluding that the law abridged the First Amendment rights of ACLU of Illinois, the court held that the law was content neutral and subject to intermediate scrutiny. *Alvarez*, 679 F.3d at 604. Then, under intermediate scrutiny, the law failed. Although Illinois argued that the eavesdropping statute was necessary to protect "conversational privacy," the court concluded that a complete ban on audio recordings "is not closely tailored" to achieving that interest. *Id.* at 607. Regarding ACLU of Illinois's available alternatives, the court added that because recordings are inherently "self-authenticating" and "uniquely reliable and powerful methods of preserving and disseminating news," it is "highly unlikely that other methods could be considered reasonably adequate substitutes." *Id.*

This case presents striking parallels. Like in *Alvarez*, the government (here, Defendant Stirling) does not dispute that ACLU-SC is entitled to attend and observe the regulated incident (here, a real-time interview between ACLU-SC and its client). Also like in *Alvarez*, SCDC prohibition on recording and publishing prisoner speech targets a specific "a medium of expression" and "an integral step in the speech process." *Id.* at 600. By doing so, it—like the eavesdropping statute in *Alvarez*—triggers First Amendment scrutiny.

If ACLU-SC is allowed to engage in real-time communication with its clients Sofia Cano and Marion Bowman (which Stirling does not contest), then it is entitled to record that speech, *see Alvarez*, 679 F.3d at 595, and (with its clients' permission) publish that speech, *see Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("As a general matter, state action to punish the publication of truthful information seldom can satisfy constitutional standards.") (internal marks omitted). To justify the policy's application to ACLU-SC, Defendant Stirling must show—at minimum— that SCDC's restriction on ACLU-SC's right to record and publish its meetings with Sofia Cano and Marion Bowman furthers an important or substantial governmental interest unrelated to the suppression of expression and that the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Martinez*, 416 U.S. at 413–14; *see also Alvarez*, 679 F.3d at 605 (applying essentially the same test under intermediate scrutiny). Accepting Plaintiff's well-pleaded facts as true, Stirling fails that test. Defendant Stirling's vague, nonspecific interest in protecting crime victims from the speech of prisoners is related "to the suppression of expression" and is not a substantial interest under *Martinez*, and the restriction is far greater than necessary to protect the asserted interest. As shown by the policies of prison systems nationwide, Stirling's interest in victim impact can be accommodated with far less extreme restrictions on protected conduct. *Supra* Part II.A.

B. <u>Defendant's Motion to Dismiss erroneously injects his own factual assertions.</u>

In arguing for dismissal, Defendant Stirling alleges his own, contradictory, facts. He alleges that SCDC's policy is "consistent with virtually every prison system in the United States," ECF 20-1 at 2, that prisoners may correspond with the media "subject to minimal restrictions," *id.*, that "reporters are free to interview those individuals who are allowed access to inmates under the department's policies, such as attorneys and family members," *id.*, and that SCDC "does not prohibit the publication of speech of inmates communicated through these permissible methods," *id.* at 3.

But under Rule 12(b)(6), the question is not whether ACLU-SC is likely to prevail on the merits, but whether, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Martin*, 858 F.3d at 248. By ignoring Plaintiff's Complaint and substituting its own, self-serving facts, Defendant Stirling's motion runs afoul of this cardinal rule.

C. <u>Contrary to Defendant's Motion to Dismiss, ACLU-SC's Complaint does not demand "special access" to prisoners and is not governed by *Pell*, *Saxbe*, or *Houchins*.</u>

ACLU-SC's Complaint and related briefs are clear: "Plaintiff does not seek additional access to its clients; it seeks only to be free from censorship during and after the interview." ECF

4-1 at 22. Despite that, Stirling argues for dismissal under three cases where the press—not counsel for incarcerated clients—sought *additional in-person access* to incarcerated people.

In *Pell v. Procunier*, 417 U.S. 817 (1974), the Supreme Court addressed a California Department of Corrections rule that prohibited members of the press from setting up in-person interviews with specific prisoners. *Id.* at 819–20. Citing the security and administrative concerns generally inherent to in-person visitation, as well as some of the specific, fact-bound concerns raised by the prison during litigation, the Court rejected the media's challenge. *Id.* at 826, 831–32. In explaining its ruling, the Court noted that "the promulgation of [the challenged policy] did not impose a discrimination against press access, but merely eliminated a special privilege formerly given to representatives of the press vis-a-vis members of the public generally." *Id.* at 831. Because the policy was agnostic regarding the press and "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public," the policy satisfied scrutiny. *Id.* at 834.

*Saxbe v. Wash. Post. Co.*, 417 U.S. 843 (1974), a companion case to *Pell*, presented the same question and was resolved in the same way. There, like in *Pell*, the Court rejected a claim by a press entity that it had a special right to conduct personal interviews with specific federal prisoners. In rejecting the challenge, the Court noted (as it did in *Pell*) that the challenged rule "is no more than a particularized application of the general rule that nobody may enter the prison and designate an inmate whom he would like to visit, unless the prospective visitor is a lawyer, clergyman, relative, or friend of that inmate." *Id.* at 849.

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) again involved a lawsuit seeking augmented *in-person* access to carceral facilities. Specifically, plaintiffs there sought to enter the Alameda County Jail to interview incarcerated people and take photographs and video of the facilities. For the same reasons as *Pell* and *Saxbe*, the Supreme Court rejected the challenge, concluding that "the media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally." *Id.* at 16.

20

This case presents a far different question. ACLU-SC alleges that it *already has* access to these specific incarcerated people, but that the challenged policy prohibits it from engaging in specific expressive activities that are protected by the First Amendment. Unlike the press plaintiffs in *Pell*, *Saxbe*, or *Houchins*, ACLU-SC is permitted by SCDC to meet with and interview its clients—so long as it doesn't record or publish its clients' speech for public consumption. If those cases were about whether the press is entitled to special access, this case is about whether a prison may *target* pure speech for special suppression. Dicta from *Pell* suggests that such a restriction would be impermissible. Describing the California policy, the Court wrote:

> Inmates are permitted to receive limited visits from members of their families, the clergy, *their attorneys*, and friends of prior acquaintance. The selection of these categories of visitors is based on the Director's professional judgment that such visits will aid in the rehabilitation of the inmate while not compromising the other legitimate objectives of the corrections system. This is not a case in which the selection is based on the anticipated content of the communication between the inmate and the prospective visitor. If a member of the press fell within any of these categories, there is no suggestion that he would not be permitted to visit with the inmate. More importantly, however, inmates have an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or *attorneys who are permitted to visit them at the prison*.

*Pell*, 417 U.S. at 824–25 (emphasis added).

As evident in that passage, the policies in *Pell*, *Saxbe*, and *Houchins* survived scrutiny because they did not discriminate against the press or against the "anticipated content of the communication between the inmate and the prospective visitor." *Id.* That is not true here. Today, video calls obviate the need for in-person interviews and, as a result, greatly reduce the security and administrative burdens associated with press interviews. Today also, phone and video calls with family members, friends, loved ones, and attorneys can be easily recorded by the non-prisoner participant and published or provided to the press for publication. Rather than accepting these developments and the increased public scrutiny they allow, SCDC's policy is designed to be a speech-seeking missile. Because the function, intent, and application of the policy here are a far cry from the narrow, firmly justified, and speech-agnostic policies at issue in *Pell*, *Saxbe*, and

*Houchins* and instead specifically target pure speech, this case cannot be dismissed under those cases.

    D.  <u>Defendant is wrong that SCDC's policy is governed by, or fails, *Turner.*</u>

Defendant Stirling argues that ACLU-SC's motion for preliminary injunction, ECF 4, should be denied because the challenged policy fails the four-factor test from *Turner v. Safley*, 482 U.S. 78, 84 (1987). ECF 20-1 at 19–26. Although Stirling does not argue that *Turner* requires dismissal, ECF 20-1 at 18 ("*Pell*, *Saxbe*, and *Houchins* mandate the dismissal of the Plaintiff's claims."), Plaintiff will, out of caution, briefly address that argument here.[4]

        1.    ***Turner* does not control because the challenged policy applies to *outgoing* correspondence and is justified by its effect on individuals *outside* the prison.**

Defendant Stirling concedes that *Martinez* applies to prison regulations that restrict a prisoner's outgoing correspondence. ECF 20-1 at 20 (citing *Thornburgh*, 490 U.S. 401). In arguing that *Turner* applies here, however, Stirling distinguishes between outgoing *communication* and outgoing *correspondence*. *Id.* It is "[f]or this reason," he argues, that "SCDC inmates are free to correspond with the general public, but not to engage in recorded interviews with anyone." *Id.* Stirling offers no precedent for his argument, and the weight of case law rejects his position. Contrary to Defendant Stirling's argument, the distinction made in *Thornbugh* does not hinge on the type of communication at issue (mail, phone call, et cetera) but on whether the prison restriction targets speech that is *entering* or *exiting* the facility. *See Thornburgh*, 490 U.S. at 412–14; *see also Houchins*, 438 U.S. at 12 (characterizing *Martinez* as being about "the right to receive *ideas and information*").

According to the Supreme Court, *Martinez*'s heightened scrutiny applies to outgoing communications for two reasons. First, outgoing communications do not only implicate the

---

[4] Plaintiff incorporates these arguments by reference in its Reply in Support of Preliminary Injunction. For reasons stated here, the merits of Plaintiff's claims are governed by *Martinez*, not *Turner*.

(limited) rights of incarcerated individuals, but also the (robust) rights of non-prisoners. *Martinez*, 416 U.S. at 408 ("Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech."), 409 ("the First Amendment liberties of free citizens are implicated in censorship of prisoner mail."); *see Houchins*, 438 U.S. at 12 (describing *Martinez* as a case about non-prisoner's "right to receive ideas and information"), 31 ("[I]n *Procunier v. Martinez*, the Court invalidated prison regulations authorizing excessive censorship of outgoing inmate correspondence *because such censorship abridged the rights of the intended recipients*.") (Stevens, J., Brennan, J., and Powell, J., dissenting); *see also Thornburgh*, 490 U.S. at 411 n.10. Second, as the Court held in *Thornburgh*, outgoing speech poses a lesser risk to internal prison order and security than does information entering the prison. *Thornburgh*, 490 U.S. at 412 (noting that outgoing communications present dangers that are "far more predictable"), 413 ("[I]mplications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials."). Notably, neither justification is tied to the type of speech involved. Whether an incarcerated person is sending a letter, talking on the phone, or communicating by video call, their speech is *leaving* the facility and being *received* by a free-world recipient.

The purpose, scope, and contours of the challenged policy all point to its focus on speech *leaving* SCDC facilities. A far cry from reporters demanding the right to physically enter prison facilities to interview specific individuals, *see Pell*, *Saxbe*, and *Houchins*, this case is about SCDC's blocking the communication of prisoner speech to the outside world. As a result, the policy must satisfy *Martinez* to survive.

On Plaintiff's as-applied challenge, the standard is even clearer. The Ninth Circuit addressed this very issue in *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002). There, the court evaluated a California rule restricting the public's access to executions. *Id.* at 873. In analyzing the matter, the court observed that "the Supreme Court has never applied *Turner* in a case such as this one, where the regulation promulgated by prison

23

officials is centrally concerned with restricting the rights of outsiders rather than prisoners." *Id.*
at 878. So too here. ACLU-SC is asserting its *own* right to record, publish, and disseminate
speech that Defendant agrees it is entitled to receive. Given that the policy targets the speech of
nonprisoners, it must satisfy *Martinez*.

> **2.    In any event, the challenged policy fails the first step of *Turner*
> because protecting victims from upsetting speech is not a legitimate
> penological interest.**

Even if the challenged policy is analyzed under *Turner*, it still fails. On *Turner*'s first
factor, the prison must show that the policy is "reasonably related to [a] legitimate penological
interest." *Morrison v. Garraghty*, 239 F.3d 648, 660 (4th Cir. 2001). Legitimate penological
interests are "security," "rehabilitation," and "institutional order." *Turner*, 482 U.S. at 89, 91; *see
also Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 357 (4th Cir. 2021).

Plaintiff's Complaint alleges that the challenged policy is "rooted in victims' rights."
Complaint at ¶¶ 16–17 (quoting Defendant Stirling and SCDC's Aug. 30, 2023, press release).
Specifically, the policy is designed to protect victims (outside SCDC) from being exposed to
prisoner speech that, hypothetically, might be upsetting. *Id.* Because this justification is not
related to security, rehabilitation, or institutional order and has nothing to do with prison
administration, it is not a legitimate *penological* interest under *Turner*.

In response, Stirling argues that Plaintiff is wrong to rely on his and SCDC's public
justification for the policy and instead asserts ten new justifications for the policy. ECF 20-1 at
22–23; ECF 20-3 (Affidavit of Bryan Antonelli). But these new allegations have no bearing on
the sufficiency of Plaintiff's claims under Fed. R. Civ. P. 12. *See Martin*, 858 F.3d at 248.

## CONCLUSION

Under well-settled law, ACLU-SC has standing. It faces a credible threat of enforcement
under the challenged policy and is entitled to maintain this pre-enforcement action rather than
expose itself and its clients to punishment for engaging in the protected conduct described in its
Complaint.

ACLU-SC's claims for relief are also more than plausible. SCDC's categorical ban on real-time interviews with the press and its total ban on recorded interviews *with anyone* is unique nationwide. No court has ever condoned such a Draconian, speech-suppressive policy, much less for a purpose that is, as here, wholly unrelated to prison security, order, or rehabilitation. Accepting the allegations in Plaintiff's Complaint as true, the challenged policy is unconstitutional both on its face and as applied to ACLU-SC's planned activities.

Defendant Stirling's Motion to Dismiss must be denied.


Dated:  April 16, 2024                                        Respectfully submitted,


**ACLU OF SOUTH CAROLINA**

*/s Allen Chaney*
Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org


**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Emerson J. Sykes*
ACLU Speech, Privacy, and Technology Project
125 Broad Street, 18th Floor
New York, NY 11230
Tel: (212) 549-2500
esykes@aclu.org

David C. Fathi**
ACLU National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org

Corene T. Kendrick***
ACLU National Prison Project
425 California St., Ste 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

*Attorneys for Plaintiff*

\*  Admitted *pro hac vice*

\*\* Admitted *pro hac vice*; not admitted in D.C., practice limited to federal courts.

\*\*\*  Admission *pro hac vice* pending