IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| American Civil Liberties Union Foundation of South Carolina, | Civil Action No. 3:24-cv-906-JDA |
| Plaintiff, | |
| vs. | |
| Bryan Stirling, in his official capacity as Executive Director of the South Carolina Department of Corrections, | REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS |
| Defendant. | |

Lacking the standing required by the U.S. Constitution, the Plaintiff seeks to overturn fifty years of binding Supreme Court precedent. In doing so, it conflates its rights with those of non-member inmates; its role as counsel with its public advocacy efforts; its legal clients with potential interview subjects; and written correspondence with audio and visual recordings. When stripped of these blurred distinctions, the Plaintiff's arguments are revealed as old wine in new skins. Consequently, its Complaint must be dismissed.

I. **STANDING**

It is axiomatic that "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 702 (1982). This rule flows directly from the nature of subject-matter jurisdiction as "an Art. III as well as a statutory requirement [and] a restriction on federal power [which] contributes to the characterization of the federal sovereign." *Id.* Despite this fundamental precept, the Plaintiff argues that this Court should simply accept its jurisdictional allegations at face value and move on. Since this approach is tantamount to allowing a party to create subject matter by artful

pleading, it is inconsistent with the constitutional underpinnings of the standing requirement. *See United States v. Texas*, 143 S. Ct. 1964, 1969 (2023) ("Article III standing is 'not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'") (citations omitted).

Rather, the Plaintiff bears the burden of proving that it has "a personal stake in the outcome of the controversy", *Baker v. Carr*, 369 U.S. 186, 204 (1962), as opposed to a mere "keen interest in the issue". *Hollingsworth v. Perry*, 570 U. S. 693, 700 (2013).  To do so, it must demonstrate that it has:

> suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical'"[;] a causal connection between the injury and the conduct complained of [, i.e.] the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court"[; and that it is] "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision.".

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-104 (1998) ("the party invoking federal jurisdiction bears the burden of establishing [the] existence" of "[t]his triad of injury in fact, causation, and redressability").

In establishing this "irreducible constitutional minimum", the Plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Furthermore, the "existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Lujan*, 504 U.S. at 569 n.4 (emphasis in original), quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989).

A.     *Injury in Fact*

Despite its insistence that it seeks to vindicate its own First Amendment rights, the Plaintiff's Memorandum in Opposition continues to focus on actual or threatened harm to its "clients", i.e. inmates.[1]  *See* ECF No. 26 at pp. 3 (policy would be enforced against clients and clients would be exposed to punishment); 6 (recording and publishing prisoner speech "would trigger punishment for…clients"); 8 (reasonable fear of discipline for "its incarcerated clients"); 13 ("unjust punishment of its incarcerated clients"); 15 (fear of punishment for clients); and 25 (exposure of clients to punishment).  This mantra is a clear attempt to manufacture standing from a potential injury to a third party and should be disregarded.

In terms of an actual injury in fact to itself, the Plaintiff claims that the Department's policy prohibits its publication of prisoner speech and that it has an "objectively reasonable" fear that it would be "punished" if it did so.  It is clear, however, that the policy does not address the publication of an inmate's word obtained in a legitimate manner, e.g. from written correspondence.  As documented, such publication has occurred in the past without any adverse consequences to the publisher.  Thus, the Plaintiff's concerns are not premised on an actual threat or evidenced by the Defendant's past conduct in similar circumstances and, therefore, are not "objectively reasonable".

---

[1] As noted, the Plaintiff repeatedly refers to inmates as "its clients or prospective clients". *See* ECF No. 26 at p. 6.  Presumably, this terminology implies legal representation.  Its Complaint, however, indicates a plan for interviews by non-lawyer employees which do not involve legal advice and are not protected by attorney-client privilege.  *See* ECF No. 1 at ¶ 28.  Accordingly, its proposed communications are not with the inmates *qua* legal clients, which is exempted from the challenged policy, but rather as the potential subjects of "multimedia storytelling".  This distinction is significant for a number of reasons, including the fact that legal consultations are not monitored by prison officials.

Although the Plaintiff relies on the Murdaugh incident as evidence of a credible threat of discipline to itself, the circumstances of that matter actually demonstrate the absence thereof. Specifically, even though the inmate's recorded words were published by a media outlet, that publisher was not "punished" in any manner. Instead, the inmate was disciplined and his attorney was cautioned for subverting the privilege of an unmonitored communication intended for legal consultation to conduct and record an interview for a third party.[2] It was this abuse of the attorney-client contact process, not the publication of the prisoner's speech, which led to the consequences described.

> As in *Younger v. Harris*, 401 U.S. 37 (1971), the Plaintiff herein:
>
> does not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible. They claim the right to bring this suit solely because, in the language of their complaint, they "feel inhibited."

*Id.* at 42. Persons with "fears of state [punishment] that are imaginary or speculative are not to be accepted as appropriate plaintiffs…." *Id.* Rather, "a chilling effect amounts to a cognizable First Amendment injury only if it is 'objectively reasonable' - that is, if the challenged government action is 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018); see also *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"), quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). As noted by the Supreme Court, "threatened injury must be

---

[2] As noted previously, the regulation at issue expressly exempts "legal professionals" from its purview, but does so only when they "may need to interview inmates for purposes of an investigation or pending legal action".

4

certainly impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

As of the outset of this litigation, the Defendant has taken no steps to enjoin or otherwise bar the publication of anything by the Plaintiff and has not threatened it with any consequences if it did so. *Cf. Cooksey*, 721 F.3d at 266 (Plaintiff had "received a telephone call from the highest executive official of a state agency, who told him she had the 'statutory authority' to seek an injunction against him if he did not bring his website in line with the Act's proscriptions").

To the extent it "feels inhibited" due to the conjectural or hypothetical potential for punishment in some undefined manner, its self-censorship is self-inflicted and unjustified by an objectively reasonable belief of "certainly impending" future harm. *See Associated Builders & Contrs. Western Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 290 (3rd Cir. 2023) (Plaintiffs did "not allege how their conduct or lack thereof will trigger some legal penalty, civil or criminal, or a threat of administrative action"). Accordingly, it has failed to establish the concrete actual or imminent injury required for standing.

B.    *Traceability and Redressability*

For the same reasons, the Plaintiff cannot prove that its self-censorship is directly traceable to the Defendant's policy. As previously noted by the Defendant:

> the fundamental requirements of Article III [preclude litigants from] manufactur[ing] standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. Any ongoing injuries that respondents are suffering are not fairly traceable to [the statute in question].

*Clapper v. Amnesty International (USA)*, 568 U.S. 398, 416 (2013).

Plaintiff attempts to avoid this rather obvious conclusion by asserting that *Clapper* was undermined by *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638 (2022).  However, the *Cruz* Court expressly recognized that the problem of the *Clapper* plaintiffs "was that they could not show that they had been or were likely to be subjected to [the government's] policy in any event." *Id.* at 1647.  Since the Plaintiff herein suffers from a similar probative infirmity, it cannot satisfy the requisite level of traceability.

Likewise, since there is no prohibition on publication of inmate speech, the Plaintiff has failed to show that a favorable decision is necessary in order for them to do so.  In addition, since the Plaintiff's representatives have already spoken with or interviewed the inmates in question, *see* ECF No. 4-2 at ¶¶ 20 and 25, they have already "received information and ideas" from these individuals.  Accordingly, there is nothing for this Court to redress.

**II.     FAILURE TO STATE A CLAIM**

    *A.     Supreme Court Precedent Requires Dismissal*

The Plaintiff's claims for relief have already been rejected by the U.S. Supreme Court in a series of cases which have been unchallenged for almost fifty years--*Pell v. Procunier*, 417 U.S. 817 (1974); *Saxbe v. Wash. Post. Co.*, 417 U.S. 843 (1974); and *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978).  The Plaintiff acknowledges these binding precedents, but claim they are entirely "irrelevant" or even support its position.  This rather remarkable assertion is based on a strained interpretation of the term "access" as used in *Pell*, *Saxby* and *Houchins*.  In other words, they contend that recording interviews with inmates for publication is not a form of "access" to these sources of information.  This proposition can be easily dismissed upon a review of the three decisions in question.

According to the Plaintiff, these rulings were based on "the challenged policies [being] tailored to accommodate legitimate *security concerns inherent to physical entry into a prison* and that the policies left open ample *alternatives for real-time communication between prisoners and the press*". ECF No. 26 at p. 4 (emphasis added). To the contrary, the prison's policy in *Pell* was not limited to contact with inmates inside the prison, but provided that "press and other media interviews with specific individual inmates will not be permitted." *Pell*, 417 U.S. at 819. Accordingly, while the media Plaintiffs in that matter did highlight the advantages of "face-to-face interviews", telephone interviews were also prohibited. *See id.* at 835 (Powell, J., dissenting in part, concurring in part) (the "regulation of the California Department of Corrections…prohibits *all* personal interviews of prison inmates by representatives of the news media") (emphasis added).[3] Likewise, the Court identified two alternatives to personal contact interviews, i.e.:

1. "[o]ne such alternative available to California prison inmates is communication by mail"; and

2. "inmates have an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison [and] provides another alternative avenue of communication between prison inmates and persons outside the prison."

*Id.* at 824 and 825.

---

[3] The lack of a meaningful distinction between "face-to-face" and telephonic interviews is apparent from the advantages of personal contact interviews advanced by the dissent in *Saxbe*. Specifically, only in such "discussion can a reporter put a question to an inmate and respond to his answer with an immediate follow-up question. Only in an interview can the reporter pursue a particular line of inquiry to a satisfactory resolution or confront an inmate with discrepancies or apparent inconsistencies in his story. Without a personal interview a reporter is often at a loss to determine the honesty of his informant or the accuracy of the information received." *Saxbe*, 417 U.S. at 854 (Powell, J., dissenting). Clearly, remote interviews conducted by audio or visual means have the same putative advantages over written communications.

7

Obviously, neither of these alternatives constitute "real-time communication between prisoners and the press".

Against this background, the *Pell* Court concluded that there was "no support in the words of the Constitution or in any decision of this Court" to "suggest that the Constitution imposes upon government the affirmative duty to make available to journalists *sources of information* not available to members of the public generally." *Id.* at 834-35. Accordingly, "access", as used by the Court, includes the ability to interview and record prisoners whether in person or by phone for journalistic purposes. This is made abundantly clear by its subsequent opinion in *Houchins* involving a media demand "to interview inmates and make sound recordings, films, and photographs for publication and broadcasting by newspapers, radio, and television." *Houchins*, 438 U.S. at 3. Implicit in its holding that the "public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes", *id.* at 9, is that recordation of interviews is part and parcel of "access" to an inmate.[4]

Similarly, the available alternatives discussed in that case demonstrate that audio/visual documentation of personal communications distinguishes such contact from other forms of access. In the words of the Court:

---

[4] The dictionary definition of "access" includes "a *way or means* of approaching, getting, using, etc.". https://collinsdictionary.com/us/dictionary/english/access (emphasis added). In his separate opinion in *Houchins*, Justice Stewart explicitly equated restrictions on the "use [of] cameras and sound equipment" with "terms of access". *Houchins*, 438 U.S. at 17 (Stewart, J., concurring). At issue in that matter was the lower court's enjoining of prison officials from "preventing [media] representatives 'from utilizing photographic and sound equipment or from utilizing inmate interviews in providing full and accurate coverage of the Santa Rita facilities.'" *Id.* at 24 (Stevens, J., dissenting).

> Petitioner cannot prevent respondents from learning about jail conditions in a variety of ways, albeit not as conveniently as they might prefer. Respondents have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions. *See Procunier v. Martinez*, 416 U.S., at 413-418. Respondents are free to interview those who render the legal assistance to which inmates are entitled. *See id.*, at 419. They are also free to seek out former inmates, visitors to the prison, public officials, and institutional personnel, as they sought out the complaining psychiatrist here.

*Id.* at 15.

Notably, these alternatives did not include either personal contact or the recordation thereof.

Accordingly, blanket prohibitions on personal contact interviews, including audio and visual recordings, with inmates indistinguishable from those imposed by the Defendant have been expressly approved by the Supreme Court. *See Saxbe*, 417 U.S. at 845 ("The District Court…held that the Policy Statement, insofar as it totally prohibited all press interviews at the institutions involved, violated the First Amendment. Although the court acknowledged that institutional considerations could justify the prohibition of some press-inmate interviews, the District Court ordered the petitioners to cease enforcing the *blanket prohibition* of all such interviews") (emphasis added). These cases also held that, given the clarity of the constitutional inquiry, it was unnecessary to address many of the arguments raised by the Plaintiff herein. *See id.* 849 (although the lower courts preferred "a selective policy whereby prison officials could deny interviews likely to lead to disciplinary problems…, it was unnecessary to engage in any delicate balancing of such penal considerations against the legitimate demands of the First Amendment"); *Pell*, 417 U.S. at 827 n. 5 ("Even with respect to inmates who may not be literate or articulate, however, there is no suggestion that the corrections officials would not permit such inmates to seek the aid of fellow inmates or of family and friends who visit them to commit their thoughts to writing for communication to individuals in the general public. Merely because such inmates may need assistance to utilize one of the alternative channels does not make it an

9

ineffective alternative, unless, of course, the State prohibits the inmate from receiving such assistance.")[5]; *Turner v. Safley*, 482 U.S. 78, 95 (1987), quoting in part *Bell v. Wolfish*, 441 U.S. 520, 554 (1979) ("As our previous decisions make clear, however, the Constitution 'does not mandate a "lowest common denominator" security standard, whereby a practice permitted at one penal institution must be permitted at all institutions.'"). Therefore, the Plaintiff's claims must be dismissed as a matter of law.[6]

      B.      *Plaintiff's Claims Should Not Be Subject to Strict Scrutiny*

The Plaintiff further claims that the Defendant's policy should be evaluated under *Procunier v. Marinez*, 416 U.S. 296 (1974), as opposed to the less stringent standard employed by *Pell*, *Saxbe* and *Houchins*, because its challenge requires the consideration of the rights of both it and "others, including prisoners". *See* ECF No. 26 at p. 17. The Plaintiffs in *Pell*, however, included both inmates and journalists. *See Pell*, 417 U.S. at 819. Notwithstanding this procedural posture, the Court ruled that the policy prohibiting "press and other media interviews with specific individual inmates" survived the First Amendment challenges mounted by both classes of litigants. *See id.*

---

[5] The *Saxbe* majority also felt it was unnecessary to address the dissent's contention that "the prevalence of functional illiteracy among the inmate population poses a serious difficulty; many prisoners are simply incapable of communicating effectively in writing." *Saxbe*, 417 U.S. at 854-855 (Powell, J., dissenting).

[6] The Plaintiff also asserts that "[i]n arguing for dismissal, Defendant Stirling alleges his own, contradictory, facts." ECF No. 26 at p. 19. This statement ignores the fact that, in seeking relief under FRCP Rule 12(b)(1) and contesting the Plaintiff's demand for a preliminary injunction, the Defendant is entitled to submit matters outside the pleadings. While these materials, including the newly filed second Affidavit of Chrysti Shain (ECF No. 29), establish the lack of any past punishment for publication of prisoner speech and the penological rationale for the challenged policy articulated prior to this lawsuit, it is not necessary to consider them for purposes of this 12(b)(6) motion.

Justice Powell's separate opinion in *Pell*—both dissenting and concurring—is instructive.[7] To wit:

> I would hold that California's *absolute ban against prisoner-press interviews* impermissibly restrains the ability of the press to perform its constitutionally established function of informing the people on the conduct of their government. Accordingly, I dissent from the judgment of the Court. [However, t]he California cross-appeals differ from the [*Saxbe v.*] *Washington Post* case in one significant respect. Here the constitutionality of the interview ban is challenged by prisoners as well as newsmen. Thus these appeals, unlike *Washington Post*, raise the question whether inmates as individuals have a personal constitutional right to demand interviews with willing reporters. Because I agree with the majority that they do not, I join Part I of the opinion of the Court.

*Id.* at 835-36 (Powell, J.) (emphasis added). Accordingly, contrary to the Plaintiff's position, the consideration of the rights of prisoners actually weakens its argument. Certainly, it cannot change the conclusion that absolute bans on personal contact interviews with inmates are constitutionally sound.

As in *Saxbe*, the proper focus should be on the Plaintiff's "essential contention…that the prohibition of all press interviews with prison inmates abridges the protection that the First Amendment accords the newsgathering activity of a free press." *Saxbe*, 417 U.S. at 844-845. In his dissent in *Saxbe*, Justice Powell expressly articulated the Plaintiff's position herein, i.e., that "the ban against prisoner-press interviews" must be reviewed under the *Martinez* standard due to its impact on the constitutional rights of the media. *See id.* at 864-65 (Powell, J., dissenting). The *Saxbe* majority declined to apply this level of scrutiny and did not even mention *Martinez* by name.

Finally, subsequent decisions have narrowly confined the reach of *Martinez*. *See Turner v. Safley*, 482 U.S. 78, 87-89 and 93 (1987) (rejecting the application of *Martinez's* least

---

[7] It should be noted that, despite Justice Powell's "split decision", *Pell* was still a majority, not plurality, decision.

11

restrictive means standard due to the intervening rulings in *Pell* and its progeny).  For example, *Thornburgh v. Abbott*, 490 U.S. 401 (1989), explicitly rejected the notion that "that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test."  *Id.* at 411.  Consequently, it felt that it was necessary to partially overrule its prior decision.  *See id.* at 413 ("In so doing, we recognize that it might have been possible to apply a reasonableness standard to all incoming materials without overruling *Martinez*: we instead could have made clear that *Martinez* does not uniformly require the application of a 'least restrictive alternative' analysis. We choose not to go that route, however, for we prefer the express flexibility of the *Turner* reasonableness standard.).  Thus, proper application of precedent "require[d] that *Martinez* be limited to regulations concerning outgoing *correspondence*."  *Id.* (emphasis added).

        In this context, Plaintiff argues that "correspondence" must be interpreted to include "outgoing prisoner speech" by any medium.  *See* ECF No. 26 at p. 17.  This ignores the fact that the personal contact interviews at issue in *Pell*, *Saxbe* and *Houchins* were patently forms of outgoing speech.  This was particularly true in *Houchins* which directly addressed the audio and visual documentation of such personal contact.  The refusal of these decisions to apply *Martinez* to such outgoing communications mandates the rejection of the Plaintiff's contention.

        It is also claimed that the distinction between outgoing correspondence and outgoing communication is not supported by case law.  *See id.* at p. 24.  To the contrary, the *Thornburgh* Court offered the following analysis:

> a careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case -- outgoing personal correspondence from prisoners -- did not, by its very nature, pose a serious threat to prison order and security.  We pointed out in *Martinez* that outgoing correspondence that magnifies grievances or contains inflammatory racial views

12

>     cannot reasonably be expected to present a danger to the community inside the prison.

*Thornburgh*, 490 U.S. at 411-412 (citations omitted).

Little imagination is required to acknowledge that multimedia broadcasts "magnif[ying] grievances or contain[ing] inflammatory racial views" could produce more "danger to the community inside the prison" than a letter. Indeed, this conclusion is compelled by the Plaintiff's own premise that audio/visual presentation of an inmate's words and expressions is more potent that than the written word. Moreover, the potential for coded messages is enhanced with real time communications which necessitate real time review by prison officials. Thus, after decades of being narrowly construed, it would be inappropriate to expand the inflexible standard of *Martinez* beyond its limited scope of application.

## CONCLUSION

As stressed by the U.S. Supreme Court in its last term, "Article III standing is 'not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'" *United States v. Texas*, 143 S. Ct. 1964, 1969 (2023) (citations omitted). Consequently, the Plaintiff may not evade this requirement by artful pleading and rank speculation. Rather, it must prove an actual or imminent injury fairly traceable to the Defendant's conduct and redressable by a favorable ruling. As of the time of Complaint herein, it cannot do so in this instance.

In addition, the Plaintiff calls for the application of inapposite case law, while continuing to ignore the obvious impact of binding precedent. When assessed under the appropriate authorities, well established jurisprudence amply demonstrates that the Plaintiff has no legal

right to the relief requested under the facts as pleaded.  Accordingly, this matter must be dismissed in its entirety.

        Respectfully submitted,

        WOMBLE BOND DICKINSON (US) LLP

        By: /s/ Kevin A. Hall
           Federal Bar No. 5375
           kevin.hall@wbd-us.com
           M. Todd Carroll
           Federal Bar No. 9742
           todd.carroll@wbd-us.com
           1221 Main Street, Suite 1600
           Columbia, South Carolina 29201
           803.454.6504

           David M. Collins
           Federal Bar No. 223
           david.collins@wbd-us.com
           5 Exchange Street
           Charleston, South Carolina 29401
           843.722.3400

        *Attorneys for Defendant Bryan Stirling, in his official capacity as Executive Director of the South Carolina Department of Corrections*

April 23, 2024